Labor and Industries of Washington, 190 Wash. 69, 66 P.2d 867, 869.

Identical skills or crafts are utilized in different industries without altering the classification of the skill and without merging the industries into one single industry. The service of repairing shoes is a branch of trade distinct from that of manufacturing shoes.

Accordingly, the Court finds that at the time of plaintiff's employment as a shoe production worker, that industry was not normally covered by teamster contract in the local metropolitan area. The Court concludes that plaintiff's years of employment with International Shoe cannot be treated as years of service for which credit can be given toward a pension from the defendant Pension Fund. Judgment will be entered accordingly.

The **UNITED STATES** of America

v.

**FUTURA, INC., a corporation, etc. and Charles F. Tunnicliff.**

**Crim. No. 3170.**

United States District Court,
N. D. Florida,
Tallahassee Division.

March 2, 1972.

Stewart J. Carrouth, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff.

Philip Parsons, Fla., Julius F. Parker, Jr., Tallahassee, Fla., for defendants.

## OPINION-ORDER

### PRELIMINARY STATEMENT OF THE CASE

MIDDLEBROOKS, District Judge.

This cause is before this Court defendants having waived their right to trial by jury and having consented to trial of this cause by the Court pursuant to Rule 23(c), Federal Rules of Criminal Procedure. Also pending is defendants' motion to dismiss the information wherein it is alleged that the provisions

of the Act and the regulations promulgated thereunder, under which the offense is charged did not create any crime or define any prohibited criminal conduct and did not provide for punishment thereof. Additionally, defendants argue that if the Act and the rules and regulations promulgated thereunder impose criminal sanctions, then they are unconstitutionally vague and void.

Defendants are the owners of certain rental property in Tallahassee, Florida. By information the United States of America has alleged that these defendants did willfully violate the Economic Stabilization Act of 1970, as amended, and the rules and regulations promulgated thereunder. The pertinent provisions of the Act read as follows:

"Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000." Section 204 of the Economic Stabilization Act of 1970, Title II of Public Law 91–379, 84 Stat. 799 (August 15, 1970); as amended by Public Law 91–558, 84 Stat. 1468 (December 17, 1970); Public Law 92–8, 85 Stat. 13 (March 13, 1971); Public Law 92–15, 85 Stat. 38 (May 18, 1971) (hereinafter referred to as the Act of 1970).

In Count I of the information it is charged that these defendants did willfully demand and receive from their tenants during the period between October 15, 1971, and November 15, 1971, rent approximately $60.00 in excess of the $100.00 ceiling rent prevailing on said property during the base period of July 16, 1971, through August 14, 1971, in violation of Section 2(c) of Economic Stabilization Regulation No. 1, Amendment No. 2, (36 F.R. 17434, August 31, 1971) pursuant to the Act of 1970 as amended and Executive Order 11615, Section 1(a) (36 F.R. 15127, August 17, 1971).

Count II charges that the defendants willfully engaged in a practice constituting a means to obtain a higher rent than permitted by Regulation 1, Section 10(a) (36 F.R. 16516, August 21, 1971) issued pursuant to the Act of 1970,

as amended, and Executive Order 11615 (36 F.R. 15127, August 17, 1971) in violation of the Act of 1970, as amended, and Executive Order 11627, Section 1 (a), (36 F.R. 20140, October 16, 1971). The substance of this charge is that defendants attempted to induce their tenants to inform the Internal Revenue Service that defendants had rolled back their rents in compliance with the Act of 1970 (when in fact defendants had not rolled back the rent) in return for a $10.00 "kickback" on the amount of rent paid by the tenants to defendants.

Count III charges a willful violation by defendants of Section 300.11 of the Price Commission's regulations (36 F.R. 23976, December 16, 1971) for their having charged their tenants during the period between November 15, 1971, and December 15, 1971, rent in excess of the base price for the rental property owned by defendants in violation of the Act of 1970, and Executive Order 11627, Section 1(a) (36 F.R. 20140, October 16, 1971).

## MOTION TO DISMISS

█ In addition to the grounds for dismissal already mentioned, defendants move to dismiss the information on the grounds that the Act of 1970 is an unconstitutional delegation of legislative authority to the Executive Branch and on the further ground that the Act and the Executive orders issued thereunder, by allowing authority to make exceptions and to grant exemptions, denies these defendants equal protection under the law. This very argument was advanced in an unrelated civil suit for declaratory and injunctive relief heard by a special three-judge tribunal of the District of Columbia wherein plaintiffs sought to enjoin enforcement of the Act, but the Court in a well-reasoned and comprehensive opinion rejected this constitutional challenge. See Amalgamated Meat Cutters and Butcher Workmen of North America v. Connally et al. 337 F.Supp. 737 (D.D.C.1971) (Three-Judge Court). This Court does not choose to depart from those principles contained therein

and thus defendants' argument in this respect must fall.

■ Insofar as defendants argue that no violations under the Act and the regulations have been charged in the information because no base period for computing rent existed at the time title to the property changed hands and ownership passed to defendants on September 22, 1971, this Court finds that argument unpersuasive, particularly when read in light of the regulations. See *e. g.* Economic Stabilization Regulation No. 1, Section 6(a) (2). Compare Rent Stabilization Regulation § 301.201(a) (36 F.R. 251, December 30, 1971).

Thus, there remains for disposition the statutory interpretation to be given the Act and the regulations by this Court. Necessarily helpful in this regard are the plain meaning and wording contained in the legislation and the legislative history surrounding its enactment.

■ The test most often articulated in determining whether a particular provision of legislation is civil or penal in character is "whether the legislative aim in providing the sanction was to punish the individual for engaging in the activity involved or to regulate the activity in question." Telephone News-System, Inc. v. Illinois Bell Telephone Co., 220 F.Supp. 621, 630 (N.D.Ill.1963) (Three-Judge Court), aff'd 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964). Legislative intent if at all possible is to be measured by objective standards contained in the legislative history of the Act, but where relevant criteria are absent which evidence legislative intent creating a penal statute, then certain other factors must be considered. These factors have been stated as follows:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in different directions." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–169, 83 S.Ct. 554, 567–568, 9 L.Ed.2d 644 (1963).

■ Adverting to these factors this Court finds that the statute and regulations issued pursuant thereto were intended to be penal in nature and reinforced by the possible imposition of criminal sanctions. The sanction which can be imposed does involve an affirmative disability or restraint. The monetary penalty, here a $5,000 fine, has traditionally been regarded as a form of criminal punishment. Violation of the Act is predicated upon a showing or finding of *scienter*, i. e. willful disobedience of the Act or regulations by the offender. The operation and enforcement of § 204 of the Act as a penal measure will promote the traditional aims of punishment, viz., retribution and deterrence.

■ Furthermore, even though § 204 of the Act lacks the generally present words of art "upon conviction thereof" so that it may be unclear on the face of the statute that the conduct to be punished is a crime, the Courts have uniformly held that if punishment in the form of a fine is imposed for violation of the statute, as distinguished from a civil remedy, the offense is criminal in nature. United States v. Krapf, 180 F. Supp. 886, 890 (D.C.N.J.1960), aff'd 285 F.2d 647 (3rd Cir. 1961).

■ Parenthetically, it should be noted that this Court has looked to subsequent congressional action in order to assess properly the legislative intent behind the enactment of § 204 of the Act. Examination of the legislative history of § 208 of Public Law 92–210, 85 Stat. 743 (December 22, 1971), the statutory successor of § 204, reveals that Congress did in fact intend that a crime be created

and did intend to provide for criminal punishment for violations thereof. The report of the Committee on Banking, Housing and Urban Affairs, United States Senate Report No. 92–507, U.S. Code Cong. & Admin. News 1971, p. 2283, stated in part as follows:

\* \* \* \* \* \*

### Sanctions

"Section 208 of the Economic Stabilization Act, as amended by this bill, relates to sanctions. There are two sanctions that may be imposed upon violators of any regulation or order issued under the authority of this committee bill. The *existing* criminal fine has been clarified to make it understood that the $5,000 fine is for each violation. [Emphasis supplied]

"A civil penalty of $2,500 for each violation may be imposed by a court. The power to impose a civil penalty gives flexibility to the court by avoiding sole alternatives of criminal sanction or nothing." *Ibid.* at 36–37.

Thus, it becomes clear that § 204 as written was purely a penal measure intended to obtain compliance with the Act. As amended § 208(b) provides for a civil penalty denominated as such with the element of *scienter* obviated from proof of the offense. This element, however, was not eliminated from § 204(a). In short, this entire section as amended allows an alternative means of enforcement, one with a less exacting standard of proof.

In light of the foregoing it can be reasonably concluded that § 204 of the Act of 1970 did create a crime and provide for criminal punishment for violations thereof, which crime and punishment was carried over into § 208 of Public Law 92–210, 85 Stat. 743 (December 22, 1971), the present version of the Economic Stabilization Act of 1970.

▮ Defendants argue with equal fervor that even if the Act and regulations do impose criminal sanctions they are constitutionally infirm as being void for vagueness. Quoting from *Telephone News Systems, Inc.*, supra, this Court assays the Act and its regulations against this constitutional standard:

"'A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation.

\* \* \* [N]o more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' *Boyce Motor Lines, Inc.* v. *United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 \* \* \* (1952)." *Ibid.* 220 F.Supp. at 626.

Coupling the above statement with the following statement from *Screws* v. *United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), one may then discern the flaw in defendants' argument:

"The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Ibid.* at 102, 65 S.Ct. at 1036.

This remark from *Screws,* supra, is especially pertinent when considered in light of the testimony adduced at trial of this cause and which privotal testimony appears more fully in this Court's findings of fact.

Defendants' remaining grounds for dismissal although not spurious, are lacking in merit and would not warrant dismissal of the information. Accordingly, the motion to dismiss will be denied and the Court will now focus attention to the merits of the cause and make the following special findings of fact and conclusions of law as allowed by Rule 23(c), Federal Rules of Criminal Procedure.

## FINDINGS OF FACT

■ Defendant Futura, Inc. is the present corporate owner of the rental property made the subject matter of this action. Defendant Tunnicliff, as agent and officer of Futura, Inc. was involved in lease negotiations with various tenants who lived on the premises during the periods in question. Testimony of the defendant Tunnicliff also revealed tht he owned a one-fourth interest in the premises involved in this action.

■ During the months of July and August, 1971, the premises were rented to a young married couple by defendants' predecessor in interest at the monthly rental of $100.00. In the latter part of August while negotiations were pending between defendants and the then present owner of the premises, defendant Tunnicliff visited the premises and advised these tenants that the rent would be raised to a monthly rental of $150.00 as soon as defendants acquired title to the premises. This defendant also advised the tenants that if they did not pay the amount to be demanded they would be asked to surrender the premises.

These tenants in turn advised defendant Tunnicliff that a rent "freeze" was in effect as a result of the President's Executive Order of August 15, 1971. Defendant acknowledged the existence of the "freeze" but he indicated to these tenants that the "freeze' could be "gotten around".

As a result of the imminent increase of monthly rental on the premises these tenants moved out. Thereafter they filed a written complaint with the Internal Revenue Service in which complaint the events above described were made known to the government.

■ Based upon this complaint the Economic Stabilization Division of the Internal Revenue Service attempted to obtain voluntary compliance with the Act by these defendants.

A Special Agent of the Internal Revenue Service contacted defendant Tunnicliff by telephone and advised him of the complaint of alleged violations which had been filed by the former occupants of the premises. At that time upon inquiry by the agent, defendant informed him that the premises were being rented to other tenants at a rate of $160.00 a month. The agent then requested that defendants voluntarily comply with the Act by "rolling back" their rent to a rate of $100.00 a month, the former level on the premises during the preceding months of July and August, 1971. Although "not cooperative" during this discussion, defendant Tunnicliff agreed to comply with the Act by "rolling back" the rent to its former level.

■ Testimony of the former owner of the premises revealed the following commercial history of this rental property:

He had acquired the property about 23 years prior to this action and had used it primarily as a place of residence for his mother-in-law. About six years ago he began to rent the premises. This witness stated that at no time during this interval did he ever rent the premises for more than $125.00 a month. The time period during which he received the highest rental on the premises was between January and June, 1971.

■ The witnesses McCampbell and Pink were tenants of defendants through the critical period charged in the information during which the alleged violations occurred. In these periods in question they paid the following rental: From late September until October 15, 1971, they paid $160.00 in rent to defendants; from October 15, 1971, until November 15, 1971, they paid rent in the same amount; and from November 15, 1971, until December 15, 1971, they paid rent in the amount of $135.00 to defendants.

On November 3, 1971, defendant Tunnicliff visited these tenants to explain to them that a letter of inquiry to them from the Internal Revenue Service would be forthcoming to ascertain if

defendants had "rolled back" their rents in compliance with the Act. This entire conversation between defendant Tunnicliff and these two tenants was electronically recorded by them and turned over to the Internal Revenue Service. Testimony of these witnesses reveals that defendant Tunnicliff sought to induce these tenants to inform the Internal Revenue Service that defendants had "rolled back" their rents in compliance with the Act, when in fact defendants had not, in return for a kick-back on their rent. In short, Defendant Tunnicliff attempted to persuade these tenants "to lie" for them in order to enable defendants to evade compliance with the Act. Defendant Tunnicliff admitted this fact in his testimony.

■ Defendant Tunnicliff took the stand in his own behalf. He testified that after having agreed to comply voluntarily with the Act and the regulations, he examined the available information and applicable law and determined that the "freeze" did not apply to the situation involved herein and that it did not cover these defendants. Although some sort of inquiry was made by this defendant at the local Tallahassee Internal Revenue Service office, he did not attempt to fully and accurately inform this agency of his intentions or seek administrative advice in respect to the commercial practices of these defendants.

This defendant's testimony further disclosed that from the onset, i. e., during the relevant time periods charged in the information, he was aware of the President's Executive Order "freezing" prices and wages, among which were included rents, and that knowing of this freeze he and Futura, Inc. intentionally increased the monthly rental on the premises in question notwithstanding the freeze because they felt the Act and regulations did not apply to them. This course of conduct continued even after defendants were advised that they were indeed affected by the Act and the regulations and were in violation thereof.

■ To refute defendants' contentions that they did not think the Act applied to them and that they were not in willful violation of the Act, Executive Orders and regulations, the government offered one rebuttal witness.

This witness explained she had been a tenant on premises owned by these same defendants adjacent to the premises in question and that she too was confronted with an increase in rent as a result in the change of ownership. She made inquiry to the Atlanta Internal Revenue Service office and was informed that defendants were covered under the Act and could not increase rents. She testified that upon advising defendant Tunnicliff to this effect he remarked to her he knew that this was the law but that there were ways to avoid the law and that he could increase the rents and would do so.

## CONCLUSIONS OF LAW

[1] This Court has jurisdiction of the action and the parties thereto.

■ [2] As used in the act the term "willfully" connotes conduct purposely done by one " 'who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements.' " Steere Tank Lines, Inc. v. United States, 330 F.2d 719, 722 (5th Cir. 1963). See in accord, Riss and Company v. United States, 262 F.2d 245, 248 (8th Cir. 1958).

■ [3] Knowledge of employees and agents of a corporation is attributable to the corporation and their acts may amount to willfulness on the part of the corporation and render it culpable under the Act. See *Steere Tank Lines, Inc.*, supra, at 722.

■ [4] The evidence convinces this Court as trier of fact beyond a reasonable doubt that defendants willfully violated Section 2(c) of Economic Stabil-

ization Regulation No. 1, Amendment No. 2 (36 F.R. 17434, August 31, 1971) issued pursuant to the Act of 1970, as amended, and Executive Order 11615 by demanding or receiving from. tenants McCampbell and Pink for the period October 15, 1971, through November 15, 1971, rents in excess of the allowable ceiling rent during a base period created by the Act, in violation of the Act, as amended, and Executive Order 11615, Section 1(a), (36 F.R. 15127, August 17, 1971) and of Title 18, United States Code, Section 2.

[5] The evidence convinces this Court as trier of fact beyond a reasonable doubt that defendants did willfully engage in a practice constituting a means to obtain a higher rent than permitted by Economic Stabilization Regulation No. 1, Section 10(a) (36 F.R. 16516, August 21, 1971) issued pursuant to the Act, as amended, and to Executive Order 11615, all in violation of the Act, as amended, and of Executive Order 11627, Section 1(a) (36 F.R. 20140, October 16, 1971), and of Title 18, United States Code, Section 2.

The evidence convinces this Court as trier of fact beyond a reasonable doubt that defendants willfully violated Section 300.11 of the Price Commission's regulations (36 F.R. 23976, December 16, 1971) issued pursuant to the Act, as amended, and Executive Order 11627 by charging a price with respect to a lease of property after November 13, 1971, which price exceeded the base price of that property, in violation of the Act, as amended, and Executive Order 11627, Section 1(a) (36 F.R. 20140, October 16, 1971) and of Title 18, United States Code, Section 2.

Accordingly, it is

Ordered:

Motion to dismiss the information be and the same is hereby denied.

Judgments of conviction and imposition of sentence shall be entered at a date to be fixed by this Court.