**UNITED STATES of America**

**v.**

**LeBEOUF BROS. TOWING CO., INC.**

**Civ. A. No. 73-915.**

United States District Court,
E. D. Louisiana.

June 14, 1974.

Allen van Emmerik, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., and Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., for plaintiff.

Charles E. Lugenbuhl, Donald R. Abaunza, Thomas J. Grace, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

Lawrence K. Benson, and John C. Christian, Milling, Benson, Woodward, Hillyer & Pierson, Austin W. Lewis, Liskow & Lewis, New Orleans, La., Richard B. Sadler, Jr., Provosty & Sadler, Alexandria, La., Clyde R. Brown, Shotwell, Brown & Sperry, Monroe, La., George J. Bailey, Bailey & Hollier, Lawrence E. Donohoe, Jr., Davidson, Meaux, Onebane & Donohoe, Lafayette, La., John T. Guyton, Hargrove, Guyton, Ramey &

Barlow, Robert Roberts, III, Blanchard Walker, O'Quin & Roberts, Shreveport, La., amici curiae.

Donald R. Abaunza, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., amicus curiae for Chotin Transportation, Inc.

Marshall Ballard, III, Burke & Ballard, New Orleans, La., amicus curiae for Penrod Drilling Co., Primal Boat Co. and Petrol Marine Co.

James G. Burke, Jr., Burke & Ballard, New Orleans, La., amicus curiae for Offshore Marine Service Assn.

Edwin K. Legnon, New Orleans, La., amicus curiae for Tidewater Marine Service, Inc. on behalf of its subsidiary, affiliated and related companies.

JACK M. GORDON, District Judge:

This case presents a question of first impression requiring the Court to decide the validity of the application of a section of the Federal Water Pollution Control Act prohibiting intentional discharge of oil into the navigable waters of the United States. The Court has concluded that the monetary sanction authorized pursuant to this statutory section at issue is invalid because, notwithstanding its nomenclature, it is unmistakably a criminal penalty, and, as such, its imposition, from this set of facts, is barred by statutory immunity induced through compulsory self-reporting of oil discharges.

The Federal Water Pollution Control Act, Title 33, United States Code, Section 1151 et seq. (hereinafter referred to as the "WPCA" or "Act"), as amended by the Water and Environmental Quality Improvement Act of 1970,[1] similar to the subject matter it affects, is complex and detailed. A general survey of the entire section at issue, § 1161 of the Act, however, provides a useful analytic backdrop against which one may probe and evaluate. A panoply of legislative guidelines, in addition to the "civil" penalty paragraph sub judice, is contained in § 1161. The section promulgates, inter alia, rules governing notification of oil spillage,[2] removal of discharged oil and allocation of the cost incurred therein,[3] exceptions to and limits

---

1. This legislation more commonly may be labelled Section 11 of the Water and Environmental Quality Improvement Act of 1970 (WQIA), amending the Federal Water Pollution Control Act. Subsections and (sub)-subsections of § 1161 of the United States Code, Title 33, substantially parallel those of Section 11. The Act was amended again in 1972, which resulted in the deletion of the element "knowingly" as a condition precedent to the invocation of the "civil" penalty when there is a discharge of oil and in the modification of the maximum amount of the "civil" penalty in Paragraph 5 of § 1161(b) from $10,000 to $5,000.

2. 33 U.S.C. Section 1161(b)(4).

3. Id., Subsections (c), (f) and (j).
   Subsection (c)(1) reads in pertinent part:
   Whenever any oil is discharged, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, the President is authorized to act to remove or arrange for the removal of such oil at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs.

Another remedial aspect, Subsection (f) protects the government and the public from shouldering the economic burden of oil clean-up and regulates removal cost. It states:
   (f)(1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil is discharged in violation of subsection (b)(2) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil by the United States Government in an amount not to exceed $100 per gross ton of such vessel or $14,000,000, whichever is lesser, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Gov-

of liability for the charged party,[4] the administrative-enforcement phase of the WPCA,[5] as well as criminal and civil penalties.[6] Early recognition of the

ernment for the full amount of such costs. Such costs shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

(2) Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any such facility from which oil is discharged in violation of subsection (b)(2) of this section shall be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil by the United States Government in an amount not to exceed $8,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such facility in any court of competent jurisdiction to recover such costs. The Secretary is authorized, by regulation, after consultation with the Secretary of Commerce and the Small Business Administration, to establish reasonable and equitable classifications of those onshore facilities having a total fixed storage capacity of 1,000 barrels or less which he determines because of size, type, and location do not present a substantial risk of the discharge of oil in violation of subsection (b)(2) of this section, and apply with respect to such classifications differing limits of liability which may be less than the amount contained in this paragraph.

(3) Except where an owner or operator of an offshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any

such facility from which oil is discharged in violation of subsection (b)(2) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil by the United States Government in an amount not to exceed $8,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such a facility in any court of competent jurisdiction to recover such costs.

4. *Id.*

5. The President of the United States is authorized to delegate the administration of this section to the appropriate federal agencies. 33 U.S.C. § 1161(*l*). By delegation from the President and the Secretary of Transportation, the Commandant of the United States Coast Guard administers and enforces the WPCA. *See*, 49 C.F.R. § 1.-46(1) and 33 C.F.R. § 153.03.

Appropriations to finance these statutory functions are derived in part from this Subsection (k) outlay and in part from the collection of *any* funds received during the operation of the Act. (Emphasis supplied). Subsection (k) reads:

There is hereby authorized to be appropriated to a revolving fund to be established in the Treasury not to exceed $35,000,000 to carry out the provisions of subsections (c), (i), and (*l*) of this section and section 1162 of this title. Any other funds received by the United States under this section shall also be deposited in said fund for such purposes. All sums appropriated to, or deposited in, said fund shall remain available until expended.

For example, the penalty included in Subsection (j) helps to allay some of the expenses inherent in the daily supervision required by the WPCA. Subsection (j) reads in toto:

(1) Consistent with the national contingency plan required by subsection (c)(2) of this section, as soon as practicable after April 3, 1970, and from time to time thereafter, the President shall issue regulations consistent with maritime safety and with marine and navigation laws, (A) establishing methods and procedures for

sundry concepts, crystallized through regulations of this section, paves the way for an improved understanding of the factual and resultant legal issues involved in this litigation.

The basic facts are not in dispute. The United States Coast Guard notified the defendant, LeBeouf Bros. Towing Co., Inc. (hereinafter referred to as "LeBeouf") that the government had proposed a penalty of $3,000 under § 1161(b)(5) of the WPCA against LeBeouf due to a gasoline spill by one of its vessels occurring on or about June 3, 1972. Shortly thereafter, a Coast Guard hearing was convened and the penalty assessed against the defendant for the June 3, 1972, spill was compromised to $2,500. Since the defendant denied the propriety of any penalty owed to the government, the matter was referred by the Coast Guard to the United States Attorney, who filed this lawsuit in order to collect the $2,500 penalty.

Sub-part (b)(4) of § 1161 of the Act sets forth the mandatory notification procedures activated by an unlawful discharge of oil into or upon the navigable waters of the United States; failure to notify the proper authorities results in the imposition of penal sanctions, although a complying party enjoys attendant immunity from criminal prosecution. This sub-section reads:

(4) Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil from such vessel or facility in violation of paragraph (2) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

The following paragraph, albeit self-described as a "civil" penalty, is the gravamen of the current litigation. Title 33, United States Code, Section 1161(b)(5) requires that:

(5) Any owner or operator of any vessel, onshore facility, or offshore facility from which oil is knowingly discharged in violation of paragraph (2) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $10,000

---

removal of discharged oil, (B) establishing criteria for the development and implementation of local and regional oil removal contingency plans, (C) establishing procedures, methods, and requirements for equipment to prevent discharges of oil from vessels and from onshore facilities and offshore facilities, and (D) governing the inspection of vessels carrying cargoes of oil and the inspection of such cargoes in order to reduce the likelihood of discharges of oil from such vessels in violation of this section.

(2) Any owner or operator of a vessel or an onshore facility or an offshore facility and any other person subject to any regulation issued under paragraph (1) of this subsection who fails or refuses to comply with the provisions of any such regulation, shall be liable to a civil penalty of not more than $5,000 for each such violation. Each violation shall be a sepa-

rate offense. The President may assess in compromise such penalty. No penalty shall be assessed until the owner, operator, or other person charged shall have been given notice and an opportunity for a hearing on such charge. In determining the amount of the penalty, or the amount agreed upon in compromise, the gravity of the violation, and the demonstrated good faith of the owner, operator, or other person charged in attempting to achieve rapid compliance, after notification of a violation, shall be considered by the President. In this context, Subsection (c)(2) of § 1161 delineates a national plan under which a coordinated system could be achieved to detect, detain, and remove oil from navigable waters with a maximum degree of efficiency.

6. *See*, § 1161(b)(4) quoted in text, *infra*; § 1161(b)(5) quoted in text, *infra*; and § 1161(j) previously cited in footnote 5.

for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46, of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary.

Defendant LeBeouf ostensibly complied with the notification proviso upon discovery of the gasoline spill and now argues that said self-disclosure provided the Coast Guard with sufficient data by which the latter could substantiate the so-called civil penalty of paragraph 5 subsequently assessed against defendant. Defendant maintains that this type of connexity between the two above quoted paragraphs makes both criminal in nature and invalidates paragraph 5 as being unconstitutional, and, accordingly, defendant has incorporated this logic' into a motion to dismiss and/or for summary judgment. The gist of LeBeouf's position is relatively facile: paragraph 5 of the Act, although containing the appellation "civil penalty", prescribes a criminal penalty and ergo is a penal, not remedial provision. Defendant avers that the immunity granted in paragraph 4 perforce must extend to cover the succeeding paragraph, since, to do otherwise, defendant contends, would abrogate the constitutional protections afforded by the Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution and unduly would circumscribe the statutory immunity of paragraph 4.

The Court concurs with the legal postulate espoused by defendant that the penalty inflicted by section 1161, subsection b, paragraph 5 of the WPCA is infirm unless it comports with the use and derivative use immunity granted in paragraph 4.

It is readily discernible from a reading of paragraph 4 that its cardinal purpose is to induce the culpable party to notify the Coast Guard about any oil spillage. A party who does not issue the requisite notice, regardless of whether such omission was intentional or unintentional, subjects itself to multiple criminal penalties, and, the litigants before the Court do not contest the fact that this penalty, without pretense, is an unadulterated penal sanction. Of course, a party who heeds the self-disclosure mandate of paragraph 4 insulates itself from prosecution conterminous with the concomitant grant of immunity. The nub of disagreement focuses on the categorization of paragraph 5, that is, if the penalty authorized by paragraph 5 is civil in nature, as contended by the government, or is a criminal sanction, as averred by defendant and amici curiae. Moreover, the effect of a determination that paragraph 5 of section 1161 is criminal in nature would subject this penalty to legislative immunity limitations enumerated in paragraph 4.

Judicial determination as to the regulatory or penal character of a statute is invariably a difficult task. A concise test frequently articulated by the courts in determining whether a particular provision of legislation is civil or criminal in character is whether the legislative aim in providing the sanction was to punish the party for engaging in the activity involved or to regulate the activity in question. *See*, Telephone News-System, Inc. v. Illinois Bell Telephone Company, 220 F.Supp. 621 (N.D. Ill.1963), aff'd, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964); United

States v. Futura, Inc., 339 F.Supp. 162 (N.D.Fla.1972). The problem of interpretation in the instant situation is compounded by the absence of any clear and persuasive legislative history showing whether the particular sanction in question was intended to punish, although part of an overall regulatory scheme. Where legislative history offers ambiguous guidelines to statutory construction, then certain other factors must be considered determinative. The Supreme Court in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963) set forth some of the more particularly relevant criteria employed in this evaluation:

> Whether the [questioned] sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

The composite of answers to these factorial inquiries indicate beyond peradventure that paragraph 5 only can be interpreted as punitive.

At first blush, the paragraph here in question appears to be nonpenal, especially in view of the purported "civil penalty" that is assessed for the proscribed activity.[7] But to be guided in the interpretative process by such superficial implements as word classification or legal jargon truly would be an analytical pitfall in allowing form to replace substance. Chief Justice Warren, speaking for the Court in Trop v. Dulles, 356 U.S. 86, 94, 78 S.Ct. 590, 594, 2 L.Ed.2d 630 (1958) recognized the patent inadequacy of such an approach when he remarked: "How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of labels pasted on them!" The real nature and intended objective of a statute must be unearthed to avoid Swiftonian-like deceit. *Cf.* Huntington v. Attrill, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892); Boyd v. United States, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).

Use of a hypothetical situation graphically demonstrates the inherent weakness in name dependency in the field of law. Imagine, for example, if Congress, as part of a broad regulatory scheme designed to remedy the current national drug abuse problem, chose to impose dual penalties, similar to these in the instant situation, upon certain proscribed activity such as possession of a small quantity of a controlled narcotic substance; first, failure to report the possession to law enforcement authorities subjects the offender to incarceration and a fine, and, second, a mandatory "civil penalty" in the form of a substantial fine is imposed because of the possession. Assuming, for the moment, that the hypothetical violator turns himself in to the authorities, immunizing himself from the initial set of "criminal" punishment revolving around disclosure,[8] then, under the second section, that person still could be penalized by the government under the guise of a "civil" assessment. This result presents a classical Catch-22 situation in complete denigration of the statutory purpose in fostering self-disclosure, inasmuch as

---

7. Moreover, it is well settled that for one act a person might be liable to pay both a criminal and a civil sanction. United States v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). See footnote 14, *infra*, and accompanying text.

8. Even if statutory immunity was not available, the offender apparently still would be free from prosecution in light of such jurisprudence as Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) and their progeny.

one would face punitive sanctions without regard to whether there is compliance with notification procedures.

As the Court will detail at a later juncture in its opinion,[9] the only means of avoiding this offensive and undesirable result in the instant case is through proper application of the immunity provision in paragraph 4, whose protective scope necessarily must embrace the paragraph 5 penalty. In fact, though not intending to suggest or condone the approach, this Court appreciates the fact that the government's position concerning the present statutory scheme encourages an offender not to report spillage when circumstances indicate that such spillage forever might be undetected since the odds markedly would favor avoidance of any penalty; on the other hand, the exemplary offender who notifies the Coast Guard of a spill has no odds to play—a monetary penalty is the inevitable and certain fate. Such discouragement of reporting oil spillage is inconsistent with the overall regulatory purpose of the Act, which requires the detection of the maximum possible number of spills, and, therefore, is not compatible with the government's proffered description of the paragraph 5 penalty as remedial rather than punitive.

Delving behind the pejoration, "civil penalty" contained in paragraph 5 of the Act, the Court additionally observes that the monetary penalty, here, exposure to a $10,000 fine, traditionally has been regarded as a measure of criminal punishment. United States v. Krapf, 180 F. Supp. 886 (D.N.J.1960), aff'd, 285 F.2d 647 (3rd Cir. 1961); United States v. Futura, Inc., *supra*. Besides the judicial philosophy regarding a fine, its mandatory imposition,[10] a fact admitted by the Coast Guard, the agency which administers the WPCA, further convinces the Court that the paragraph 5 penalty simply constitutes a complementary means by which to criminally punish the wrongdoer rather than effectuating and regulating purposeful public policy sought to be achieved by the Act.[11]

---

9. See footnote 13, *infra*, and accompanying text.

10. It is Coast Guard policy to affix a penalty under paragraph 5 at or near the maximum amount unless extenuating circumstances, statutorily enumerated, justify mitigation. Identified as Appendix A, United States Coast Guard Commandant Instruction 5922.-11A and explanatory enclosure promulgates this administrative attitude with respect to 33 U.S.C. § 1321(b)(6), the 1972 revised counterpart of 33 U.S.C. § 1161(b)(5). See footnote 1, *supra*.

11. This juridical determination is supported by the touchstones employed in meting out a paragraph 5 penalty, namely, wealth of the offender and gravity of the violation. These same factors characteristically and invariably are used by courts as guideposts when sentencing criminal defendants. Compare the text accompanying footnote 14, *infra*.

In this same vein, defendant also assails the criteria upon which the paragraph 5 penalty is bottomed and suggests to the Court that such a standard is unconstitutional as violative of the Fifth and Fourteenth Amendments to the United States Constitution. Defendant particularly objects to the statutory language requiring that assessment of the mandatory penalty in question dually be conditioned on the size of an offender's business and the effect of such a penalty on that party's ability to continue in business. Subsequent to the June 3, 1972, violation, the government communicated by letter to LeBeouf that the Coast Guard intended to assess a penalty statutorily dictated by said offense based on the "size and stability of defendant's business." Movant argues that such an assessorial guage invidiously violates its right to equal protection of the laws since it falls with unequal weight on some offenders, and, accordingly, fails to pass constitutional muster. As a response, the government maintains that the policy of the Coast Guard consists of imposition of a penalty at or near the maximum ($10,000), an allegedly reasonable figure, unless justifiably mitigated by one or more of the three statutory considerations. The three factors which can justify an assessment of a lesser amount involve: (1) the size of the business of the owner or operator charged; (2) the effect that the penalty may have on the owner or oprator's ability to continue in business; and (3) the gravity of the violation.

Alternatively, the government urges that any disparity which may exist among charged owners or operators of varying degrees of wealth clearly is justifiable to with-

Simply stated, the Court cannot find any legitimate governmental purpose served by paragraph 5 save to reprimand the wrongdoer, by providing a pecuniary punishment, and, to deter others from illicitly discharging oil into the waterways.[12]

■ As previously mentioned, accentuated by juxtaposition, the Court cannot overlook the active interplay that transpires between paragraphs 4 and 5. In view of the unique legal symbiosis that exists between the requirement under attack and its contiguous and preceding subsection, the Court is constrained to read and interpret these two paragraphs in para materiae. The prohibitions, operations, and end results of the two paragraphs are inextricably intertwined; this type of interlocking dependency, if allowed, would provide a circuitous, but nonetheless definite means of impairing and perhaps nullifying a potential offender's guarantee of statutory immunity. This in tandem situation entices, if not obligates, a party to report to the Coast Guard any violations of the Act, and, undoubtedly extracting the bulk of material and incriminating facts from this requisite disclosure, the Coast Guard automatically mulcts the determined sum against the self-admitted offender. To sanction this backdoor procedure ignores paragraph 4's explicit proscription against any usage of incriminatory data garnered through compelled self-disclosure; the monetary penalty lodged here against LeBeouf improperly was sustained upon information obtained via self-disclosure.[13]

stand constitutional scrutiny inasmuch as it is reasonably related to the prime objective of the WPCA legislation.

Based on the well-settled principle that decisions on constitutional issues should be avoided if the case can be decided on a nonconstitutional ground, see Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 1227, 31 L.Ed.2d 536 (1972); Calhoun v. Cook, 487 F.2d 680, 683 (5th Cir. 1973); Mengelkoch v. Industrial Welfare Comm'n, 442 F.2d 1119, 1125 (9th Cir. 1971), the Court elects to reserve judgment on defendant's equal protection argument at this time in deference to the Court's classification of § 1161(b)(5) as penal in nature. However, the Court acknowledges that such an equal protection claim must be examined in light of recent language by the Supreme Court upon reviewing purported discrimination on the basis of wealth. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). But cf. San Antonio Independent School District v. Rodriguez, 411 U.S. 70, 87–90, 102, n. 61, 117, 93 S.Ct. 1315, 1324–1325, 1332, n. 61, 1340 (Marshall, J., dissenting).

12. The mood of this country and the philosophy of a number of its congressional representatives with respect to the purity and quality of our national waterways is a factor not to be lightly heeded when examining paragraph 5. The WPCA, reviewed as a whole, meritoriously projects the need to protect the national environment and to promote the social welfare; however, the paragraph 5 sanction exists mainly, if not solely, to punish those who fail to abide by the regulatory provisions of the Act, and, not conversely, as an impetus to pragmatically and justly regulate users and handlers of petroleum. This section is not overshadowed by the general remedial tenor of the Act.

In classifying paragraph 5 as penal, two particularly noteworthy supportive indicia can be gleaned from the legislative history. One, the legislators' policy to "err on the side of strength." See, e. g., 115 Cong.Rec. 9024 (remarks of Cong. Wright). Two, the legislative history of the WPCA is replete with allusions to the same single pair of major oil disasters, The Torrey Canyon off the coast of England, and the oil spill off the coast of Santa Barbara, California. See, e. g., 115 Cong.Rec. 9016 (remarks of Cong. Fallon), id. at 9017 (Cong. Blatnik), id. at 9024 (Cong. Wright), id. at 9028 (Cong. Howard), id. at 9033 (Cong. Cleveland), id. at 9034 (Cong. Miller), id. at 9039 (Cong. Karth), id. at 9040 (Cong. Dingell), id. at 9051 (Cong. Fascell). Of course, such calamities do properly serve as the necessary catalysts in creating protective legislation, though it is seemingly harsh to judge everyday conduct in petroleum work operations by a few isolated acts in extremis.

13. From an overview of the Coast Guard's own guidelines, it is intuitively apparent that the agency's present modus operandi with respect to paragraph 5 penalties flagrantly violates the immunity granted in the preceding paragraph 4 of section 1161. To reiterate, the pertinent language of paragraph 4 reads: "Notification received pursuant to this paragraph or information obtained by

Hence, the Court finds that the procedure implemented in the instant case, utilization of compelled admissions to support imposition of a criminal penalty, does not accommodate the statutory protection embodied in paragraph 4 of section 1161 of the WPCA, and, accordingly, this deficient procedure must be rejected.

■ Although the Court has expended considerable commentary on the criminal-remedial dichotomy of section 1161, an equally, if not more significant area of analysis also must be examined. To the knowledge of the Court and assumably the litigants, these mutually dependent paragraphs, four and five, constitute sui generis legislation; that is, this statutory situation is the only determinable instance where Congress has coupled a punitive, albeit denominated "civil", sanction with a mandatory and criminally enforceable self-notification procedure (the constitutional validity of such procedure being protected by a statutory grant of immunity conterminous with that of the Fifth Amendment), with the latter procedure invariably triggering imposition of the punitive sanction. Regardless of how the Court classifies the paragraph 5 penalty, criminal or remedial, the result is the same: this type of statutory operation is impermissible.

Otherwise, Congress would be able to accomplish indirectly what it cannot do directly—impose a penalty on an offender bottomed on information received through the required notification process. While the Court recognizes that certain civil pecuniary assessments, even though connoting punishment, are per se sound, e. g., Rex Trailer Co. v. United States, 350 U.S. 148, 152, 76 S.Ct. 219, 100 L.Ed. 149 (1956), Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), none of these are initiated by a self-disclosure mandate. As exemplified in an aforementioned hypothetical situation,[14] this two-fold procedure is subject to legislative abuse with respect to the traditionally criminal laws as well as other publicly obnoxious conduct in the sense that it provides a vehicle by which to totally circumvent the protective guarantees against self-incrimination under the Fifth Amendment or a grant of statutory immunity.

While the paragraph 5 proceeding is civil in form, it is, at minimum, quasi-criminal in nature since any penalty authorized pursuant to paragraph 5 is incurred by the commission of an offense against the law, namely, violation of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 407, 411. See, Boyd v. United States, supra. Barred

---

the exploitation of such notification shall not be used against any such person in *any criminal case*, except a prosecution for perjury or for giving a false statement." (emphasis supplied) *See*, United States Coast Guard Commandant Instruction 5922.11A, reproduced and marked herein as Appendix A.

Automatic imposition of a paragraph 5 penalty assessed immediately after self-disclosure pursuant to paragraph 4 further suggests to this Court that said penalty is conferred in direct derogation of the principles of use and derivative use immunity, and likewise, is in conflict with the protective purpose of the immunity provision found in paragraph 4. *See*, Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Zicarelli v. New Jersey State Comm'n, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); United States v. Mobil Oil Corp., 464 F.2d 1124 (5th Cir. 1972). *Cf.*, Murphy v. Waterfront Comm'n,

378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); Lees v. United States, 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150 (1893); United States v. T/B CTCO 186–20 (S.D.Tex.1974).

It is axiomatic, then, that once a defendant, such as LeBeouf, reports an oil spill, the prosecuting federal authorities have the burden of showing that their evidence is not tainted, and, to accomplish this, the government must establish that the evidence it proposed to use in support of the paragraph 5 penalty is derived from a source wholly independent of the compelled disclosure. *See*, Kastigar v. United States, *supra*; Zicarelli v. New Jersey State Comm'n, *supra*. *See generally*, Michigan v. Tucker, —— U.S. ——, ——, ——, n. 2, 94 S.Ct. 2357, 2361–2364, 2369, n. 2, 41 L.Ed.2d 182 (1974) (Brennan, J., concurring).

14. See footnote 8, *supra*, and accompanying text.

from prosecuting an offender under the 1899 Rivers and Harbors Act due to the Fifth Amendment and the statutory immunity clause, *see*, United States v. Mobil Oil Corp., 464 F.2d 1124 (5th Cir. 1972), the government cannot then affix a monetary penalty founded upon the fruits of self-disclosure. Though the paragraph in question appears viscerally to deviate only in the slightest and mildest degree from a true remedial sanction, a deviation the Court earlier stated to be much broader, it markedly violates the protected domain against self-incrimination. To issue juridical approval over this procedure would signal a failure on the part of the Court to adhere to this constitutional and statutory protection. Moreover, were the Court to countenance this paragraph 5 mechanism, such approval presumably would provide the precedent for further piecemeal degradation of the party's protected right. As the Court in Boyd v. United States, 116 U.S. at 635, 6 S.Ct. at 535, observed:

> It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachment thereon. Their motto should be *obsta principitis*. We have no doubt that the legislative body is activated by the same motives; but the vast accumulation of public business brought before it sometimes prevents it, on a first presentation, from noticing objections which become developed by time and the practical application of the objectionable law.

The passage of time combined with increased usage has revealed the instant piece of legislation, as currently administered, to be well within the pale of the above quoted *Boyd* caveat. Accordingly, this Court would be derelict in its duty to protect the rights of the citizen before it if the Court were to sanction application of paragraph 5 of section 1161(b) of the WPCA as the government contends.

The government urges this Court to follow the rationale recently opined by the Supreme Court in One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972). In *One Lot*, the defendant, who previously had been acquitted to smuggling, pleaded this finding in bar of a forfeiture action by the government against the allegedly smuggled merchandise. Rejecting this argument, The Supreme Court noted that collateral estoppel would bar any proceedings to forfeit undeclared goods if, in earlier criminal proceedings, the elements of forfeiture had been resolved against the government. The Supreme Court, however, held that the defendant's acquittal on the smuggling charge did not prohibit a subsequent action to forfeit goods allegedly smuggled since the acquittal on the criminal charge may have turned on a finding that the act was not done with the requisite intent. More specifically, the Court concluded that the forfeiture proceeding was a civil remedy rather than a criminal penalty, and therefore, its imposition was not barred by the earlier acquittal. Notwithstanding this conclusion, the present inquiry does not terminate because the factual and legal setting in *One Lot* visibly is distinguishable from the case before the Court. This Court does not question nor criticize the well-established Supreme Court pronouncements sanctioning forfeiture statutes as a supplement to criminal enactments, *see*, Calero-Toledo v. Pearson Yacht Leasing Co., —— U.S. ——, 94 S. Ct. 2080, 40 L.Ed.2d 452 (1974),[15] and recognizing that Congress may impose both a criminal and a civil (perhaps,

---

15. An historical insight into the origin, development, and usage of forfeiture statutes is found in Calero-Toledo v. Pearson Yacht Leasing Co., —— U.S. at ——, 94 S.Ct. at 2090.

Plainly, a significant distinction between *One Lot*, the forfeiture case upon which the government relies, and the case at bar is anchored on the fact that statutory forfeitures generally are enforced under the *in rem* procedure whereas the instant paragraph 5 penalty attaches *in personam*.

more properly styled non-criminal) sanction in respect to the same act or omission. *See,* Helvering v. Mitchell, *supra.* In the case cited by the government, the Supreme Court cogently pointed out the congressional intention to formulate corresponding but distinct criminal and non-criminal sanctions, whereas, by contrast, the government's argument in the instant case presupposes the existence of this legislative design. To the contrary, there is no clear legislative expression indicating that paragraphs 4 and 5 of section 1161 are penal and remedial respectively; rather, this Court, predicated on aforementioned observations, finds both of these to be disciplinary penalties intended to punish and deter, and it is this duplicity of criminal punishments that undoubtedly is denounced by the Court in *One Lot.* One significant difference which tends to stultify if not abrogate the parallelism between *One Lot* and this litigation that the government proffers is that the questioned monetary penalty of the forfeiture provision in *One Lot* serves to reimburse the government for investigative and enforcement expenses while its counterpart, the sanction lodged in paragraph 5 of the WPCA, is not addressed to any similar direct fiscal restitution,[16] although other provisions of the Act support avenues by which the government pointedly could recoup its outlays.[17] Another distinction rests upon the mandatory notification provision in the present case and the absence of a similar mandate in *One Lot.* Hence, it is inescapable that paragraph 5 only can be characterized as a punishment for the infraction of the law following a visceral determination by the Coast Guard of guilt based upon self-admission, since the provision nei-

ther contemplates restitution for damage nor reimbursement to the government for enforcement expenses.

■ To recapitulate, the Court is of the opinion that the penalty mandated by paragraph 5 of Section 1161, United States Code, Title 33, is purely and simply criminal in nature. After adjudicating this penalty to be criminal and not regulatory, the Court, in light of the preceding paragraph 4 statutory immunity provision, necessarily must rule that the penalty under paragraph 5 only can be enforced if it is supported by information independently derived from the statutory self-disclosure compulsion in paragraph 4.[18] To rule otherwise would contravene the legislative privilege against self-incrimination afforded to the party who notified the government in compliance with paragraph 4. Inasmuch as the Court believes that the Coast Guard's principal, if not singular, source of evidence for the instant prosecution under paragraph 5 was derived from the defendant's compelled report in violation of the immunity provision of paragraph 4, the $2,500 penalty assessed against LeBeouf cannot stand.

Accordingly, it is ordered that the motion for summary judgment filed by the defendant, LeBeouf Brothers Towing Co., Inc., is hereby granted.

### APPENDIX

### UNITED STATES COAST GUARD
### 23 FEB 1973

COMMANDANT INSTRUCTION 5922.-11A

Subj: Pollution Law Enforcement

1. *Purpose.* This instruction promulgates guidance for the assessment of

---

16. Assuming, arguendo, that the government's position, that is, paragraph 5 provides operating revenue for § 1161—so it must be remedial, is correct, then the same rationale necessitates that paragraph 4, an undisputed penal sanction, be categorized as remedial since the result of subsection (k) channels all proceeds, regardless of their genesis, to the mainstream of operative cost. For the Court to rest its classification of

the penalty at issue on this singular factor, as the government suggests, would be unrealistic. See footnote 5, *supra,* for the text of subsection (k).

17. *See* footnotes 3, 5, and 16, *supra,* and accompanying text.

18. See footnote 10, *supra,* and accompanying text.

civil penalties pursuant to Section 311(b)(6) of the Federal Water Pollution Control Act (FWPCA).

2. *Cancellation.* Commandant Instruction 5922.11 is cancelled.

3. *Discussion.*

a. It is Coast Guard policy that every reported or discovered discharge of oil be investigated and that every discharge in violation of Section 311(b)(6) result in the assessment of a civil penalty.

b. In cases with extenuating circumstances, mitigation may be considered upon review and a compromise amount agreed upon. In those cases, the assessed penalty will become a matter of record as well as the compromise action taken.

c. In determining the amount of a penalty, only the factors set forth in the Act shall be considered. In this way, it is anticipated that the general level of penalties will be raised to a more meaningful level.

4. *Action.*

a. Enclosure (1) shall be used as the guideline for the assessment of a civil penalties pursuant to Section 311(b)(6), FWPCA.

b. Information contained herein is intended to be used in conjunction with the National Contingency Plan as implemented by COMDTINST 3020.3 series.

/s/ J. D. McCann

J. D. McCANN
Acting Chief, Office of Marine Environment and Systems

Encl: (1) Coast Guard policy for the application of Civil penalties under Section 311(b)(6), FWPCA

Enclosure (1) to COMDTINST 5922.11A
23 FEB 1973

## COAST GUARD POLICY FOR THE APPLICATION OF CIVIL PENALTIES UNDER SECTION 311(b)(6), FWPCA

Consistent with the language of the Federal Water Pollution Control Act, Coast Guard policy requires the assessment of a civil penalty for each discharge of oil in violation of Section 311(b)(3). A maximum penalty of $5,000 is authorized by Section 311(b)(6); however, the drafters of the Act envisioned lesser penalties in certain circumstances. Section 311(b)(6) provides that, "In determining the amount of the penalty . . . the appropriateness of the penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered . . . ." That is to say that the penalty might be less than $5,000 for a small business, for a business which would be forced out of operation by the maximum penalty, or for a violation of minor gravity. It should be noted, however, that these factors are not to be considered in determining whether a discharge should be investigated or whether a penalty should be assessed. The statute requires that a civil penalty be assessed for each violation of Section 311(b)(3). It is Coast Guard policy to assume that the penalty will be at or near the maximum unless a lesser penalty is clearly justified by one of the factors listed in Section 311(b)(6).

A number of considerations may be made in determining the gravity of a violation, such as the degree of culpability associated with the violation, the prior record of the responsible party, and the amount of oil discharged. Substantial intentional discharges should result in severe penalties, as should cases of gross negligence, and so on. This is not to suggest that other considerations may not combine to determine the gravity of a violation.

Two factors should not be considered in fixing the amount of a civil penalty: (1) the responsible party's removal effort or expense and (2) a decision by Federal and/or state authorities to bring criminal action for the same discharge. Liability for a civil penalty under Section 311(b)(6) attaches at the time of discharge. It is entirely unre-

lated to the subsequent removal responsibility for which the discharger must bear the expense, either directly or by reimbursing the Pollution Fund. In no case may a responsible party avoid or reduce a civil penalty by removing the discharged oil. Federal or state criminal prosecutions for the same discharge do not affect the imposition or amount of a civil penalty. Criminal prosecutions are brought under separate authority such as the Refuse Act of 1899. They are neither intended as substitutes for civil penalties nor do they create a legal bar to subsequent civil penalties. Civil penalties should, therefore, be assessed for all violations of Section 311(b)(3) without regard to pending or anticipated criminal action.