**UNITED STATES of America,
Plaintiff,**

v.

**EUREKA PIPELINE COMPANY,
Defendant.**

**Civ. A. No. 74–7–P.**

United States District Court,
N. D. West Virginia,
Parkersburg Division.

Oct. 8, 1975.

James F. Companion, Wheeling, W. Va., for plaintiff.

John R. Morris, Parkersburg, W. Va., for defendant.

## MEMORANDUM ORDER

MAXWELL, Chief Judge.

This civil action was filed on May 7, 1974 by the Plaintiff, United States of America, to recover sums which it claims are due and owing from the Defendant, Eureka Pipeline Company, as a result of twelve violations of Section 1321(b)(3) [1] of the Federal Water Pollution Control Act (FWPCA), as amended 1972, 33 U.S.C. § 1251 *et seq.*, which

---

[1]. 33 U.S.C. § 1321(b)(3) provides:

The discharge of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in harmful quantities as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges of oil into the waters of the contiguous zone, where permitted under article IV of the International Convention for the Prevention of Pollution of the Sea by Oil, 1954, as amended, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards.

prohibits "the discharge of oil or hazardous substances into or upon the navigable waters of the United States . . . ." The twelve original violations occurred between October 23, 1972 and February 3, 1973. On March 8, 1975, the Plaintiff amended its complaint to include seven additional violations during the periods of July 7, 1973 to September 5, 1973. The Defendant admits the occurrence of all nineteen of the violations alleged.

In compliance with 33 U.S.C. § 1321(b)(5) [2] all violations were reported by the Defendant to the appropriate authorities as required by paragraph (5). Upon review and pursuant to 33 U.S.C. § 1321(b)(6) [3] a total of $9,900.00 has been assessed against the Defendant. The Defendant has refused to pay these penalties claiming that paragraph (6) is unconstitutional on its face and/or as applied and has filed Motions to Dismiss and/or for Summary Judgment with respect to all said violations.

Defendant alleges several grounds upon which the statute here in question is unconstitutional. These shall be considered seriatim.

Defendant first attacks the statute by stating that the reporting requirement of paragraph (5) results in self-incrimination in violation of the Fifth Amendment to the United States Constitution, when the information so gathered is later used to impose fines or penalties under paragraph (6).

While the information received pursuant to paragraph (5) may not be used in a criminal case against the person reporting the discharge, Defendant claims that the use of this information to assess what is referred to as a "civil penalty" reaches the same result. Thus, Defendant claims, the immunity granted by paragraph (5) should be extended to cover the penalty imposed by paragraph (6) which it claims is also penal in nature.

The fact that Congress in enacting the legislation here under scrutiny chose to call the penalty "civil" must be given great weight. "When Congress has characterized the remedy as civil and the only consequence of a judgment for the Government is a money penalty, the courts have taken Congress at its word." *United States v. J. B. Williams Company, Inc.*, 498 F.2d 414, 421 (2d Cir. 1974). But the forms ascribed to the penalty by a label must not be the sole criterion upon which a decision as to its

---

2. 33 U.S.C. § 1321(b)(5) provides:

Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

3. 33 U.S.C. § 1321(b)(6) provides:

Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this

subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46 of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary.

true meaning turns. The Court must be concerned with substance also. This was emphasized by Chief Justice Warren, when speaking for the Court in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958); he said, "How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of labels pasted on them!"

▉ A review of the substance of a congressional statute necessarily begins with consideration of the legislative history to uncover any indications of legislative intent. *Telephone News System, Inc. v. Illinois Bell Tele. Co.*, 220 F. Supp. 621 (N.D.Ill.1963). Such a review in this instance fails to reveal conclusively whether Congress intended this penalty to regulate or prevent discharges, which would evidence a civil sanction, or to provide punishment for the conduct in order to punish the offender and deter others, in which case the sanction would be penal in nature. *Telephone News, supra.*

While nothing in the legislative history explicitly indicates whether Congress intended the penalty imposed by paragraph (6) to be penal or civil in nature there are certain implicit indications which are helpful to an understanding of its intent.

The congressional policy relating to the Act is stated in 33 U.S.C. § 1251(a) as follows: "The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." This indication of a desire to keep the Nation's waters free from pollutants was further buttressed when Congress stated: "The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States . . . ." 33 U.S.C. § 1321(b)(1).

This language from these two sections of the FWPCA points up the great concern of Congress over the problem of water pollution and indicates a desire to reduce the pollution level already existing as well as to prevent future discharges which might add to the problem. This is made even more clear when it is remembered that the predecessor to the FWPCA was passed by Congress just after two great oil catastrophes had occurred with the Torrey Canyon incident off the coast of England and France in 1967 and the Santa Barbara blowout in 1969.

One remaining implicit indication of congressional intent with regard to the penalty under paragraph (6) is important. In October of 1972 certain amendments were enacted with respect to the FWPCA. 33 U.S.C. § 1161(b)(5), which then became 33 U.S.C. § 1321(b)(6), was changed in two important respects. Where before the amendments a civil penalty could only be imposed when an owner or operator "knowingly discharged" into the navigable waters of the United States substances in violation of the Act, the amendment deleted this element of scienter. Further, where the civil penalty which could be assessed under § 1161(b)(5) was $10,000 for each offense [the same amount as the criminal penalty for failure to give notice of an unlawful discharge under § 1161(b)(4)], the amendment reduced the amount of the maximum civil penalty to $5,000 for each offense.

These changes, the Court believes, evidence a desire on the part of Congress to move away from the appearances of criminality which could have been ascribed to § 1161(b)(5). That the Congress had reason for its concern is affirmed by the finding in *United States v. LeBeouf Bros. Towing Co., Inc.*, 377 F.Supp. 558 (E.D.La.1974), that the penalty imposed by § 1161(b)(5) was penal in nature.

As indicated above, the only reflections of legislative intent which appear from the legislative history of the Act are implicit. Congress did not spell out its intent with regard to the penalty here in question. Where a review of the

legislative history fails to disclose whether Congress intended the penalty to be penal or civil in nature the Supreme Court has enunciated some important factors for consideration in determination of the meaning to be ascribed to the penalty. Thus, in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168, 83 S.Ct. 554, 568, 9 L.Ed.2d 644 (1963), the Court outlined the following factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purposes assigned. . . .

Consideration of the penalty at issue with regard to these factors reveals the following:

The penalty appears to involve an affirmative disability or restraint. It is like that imposed for a violation of Section 204 of the Economic Stabilization Act of 1970 which states, "Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000." This penalty was found to impose an affirmative disability or restraint by the court in *United States v. Futura*, 339 F.Supp. 162 (N.D.Fla. 1972).

■■ While monetary penalties have traditionally been regarded as a form of criminal punishment, *Futura, supra,* their collection as a civil remedy is widely accepted. And where collection of the penalty is to be effectuated through a "distinctly civil procedure", congressional intent to impose a civil rather than criminal sanction is clear. *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). As indicated in footnote 3, *supra*, the assessment is first

made by the Secretary of the department in which the Coast Guard is operating. Then if payment is not recovered, a civil action, such as that before the Court, is instituted by the attorney for the United States.

As earlier indicated, while 33 U.S.C. § 1161(b)(5) required scienter before the penalty could be imposed, the 1972 amendments dropped this requirement from § 1321(b)(6).

■ Language from the Senate Committee which considered the Amendments of 1972 indicates that deterrence was to be one result of the penalty imposed by paragraph (6). The committee wrote, "The Committee believes that the discharge of such substances should be subject to penalty even though clean up is not practicable. In this way, each carrier or handler evaluates the risk of discharge and determines whether or not the potential penalty is worth the risk." Pub.L. No. 92–500, § 311, 1972 U.S. Code Cong. and Admin.News, p. 3732. However, the fact that the penalty will deter unlawful discharges of oil does not, without more, render it criminal in nature. Monetary penalties imposed for infractions of statutes of the United States have often been viewed as civil in nature rather than criminal, especially where their purpose is to regulate the activity involved. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 81 L.Ed. 443 (1943); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909).

■ The unlawful discharges, here complained of by the Government, could be punished criminally pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 407 and 411. However, one who reports an unlawful discharge is protected from criminal prosecution under the Rivers and Harbors Act by 33 U.S.C. § 1321(b)(5) unless the prosecution is based on information outside his notification under § 1321(b)(5) or the fruits

thereof. *United States v. Republic Steel*, 491 F.2d 315 (6th Cir. 1974). Although the fact that the act for which a civil penalty may be imposed is also subject to criminal punishment may be an indication that the penalty is criminal, *United States v. Constantine*, 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233 (1935), it is not determinative since Congress may impose both a criminal and a civil sanction for the same act. *Helvering v. Mitchell, supra.*

There appear to be three possible alternative purposes to which the penalty assessed under paragraph (6) might be assigned. First, these sums could be used to cover the costs of investigation and enforcement of the Act. Second, they could be used to cover the costs of cleaning up the discharges. And third, they might be compensation for tortious damages done to the environment by the discharge.

Oftentimes sums collected as penalties are used to cover the costs of investigating violations of and for enforcement of the statute under which they are collected. Such is the case where goods are brought into the United States without being included in a declaration and entry. Such goods are forfeited to the government pursuant to 19 U.S.C. § 1497 for the enforcement and investigation of the statute. *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972). Where such a disposition is to be made of the sums collected, the purpose is generally stated in the context of the statute itself as indicated in 19 U.S.C. § 1613. The FWPCA provides that funds received under the provisions of § 1321 should be deposited in a revolving fund established to carry out various functions such as administration of the provisions of the statute, removal of discharged substances, expenses incurred where a maritime disaster has caused a discharge and reimbursement to those who clean up discharges caused by an act of God, act of war, negligence of the United States government or act of a third party. 33 U.S.C. § 1321(k).

The second possible alternative use for the sums collected, their application to the costs of cleaning up the unlawful discharges from which their collection results, does not seem to be a viable alternative in view of the language used by the Senate Committee and earlier referred to herein. The committee indicated a desire to impose the penalty regardless of the feasibility of clean-up. Further, this alternative is already provided for in part by § 1321(f) which requires that a party who fails to prove that the unlawful discharge with which he is charged was the result of an act of God, an act of war, negligence by the United States Government or an act or omission of a third party is liable for clean-up costs up to a $14,000,000 limit unless the discharge was a result of his wilful misconduct or wilful negligence which would result in liability without limit for the clean-up costs incurred.

In a recent case one court construed the penalty as compensation for harm done to the environment even though the defendant had completely cleaned up the oil it had discharged. *United States v. W. B. Enterprises, Inc.*, 378 F.Supp. 420 (S.D.N.Y.1974). The court in that case stated at page 422, "The Secretary of the Interior has determined that environmental damage results from a discharge of oil. The penalty assessed in this case was clearly a civil, remedial penalty designed to compensate the government for this harm." Thus, the penalty could be construed as compensation to the government for tortious damages to the environment.

The penalty assessed for each of the nineteen discharges of oil here in question appears to be reasonable if applied to either of the two viable alternatives above discussed. The maximum penalty allowed by paragraph (6) is $5,000. The average penalty assessed for each of the spills here in question was $521. This compares favorably with the $500

recovery in *W. B. Enterprises, supra,* where the defendant had already cleaned up all of the oil on its own. Certainly, the amounts assessed are not so clearly excessive or unreasonable as to indicate an intent by Congress to make them criminal in nature. *United States v. Constantine, supra; Telephone News, supra.* This indication of a desire to make the penalty civil rather than criminal in nature is supported by the further provision that factors relating to the ability of the party to pay and the gravity of the offense be taken into consideration in computing the sum of the penalty.

The above-discussed traditional factors, outlined in *Mendoza-Martinez,* also fail to indicate conclusively whether a civil or penal nature should be ascribed to the penalty imposed by paragraph (6). But in any case unmistakable evidence of punitive intent is required before a congressional enactment of this kind may be struck down. *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L. Ed.2d 1435 (1960); *Telephone News, supra.*

In the *LeBeouf* case, relied upon heavily by the Defendant, where the court was faced with nearly the same situation as that presented here, the court found that the penalty imposed by § 1161(b)(5) [later amended and codified as § 1321(b)(6)] was penal rather than civil in nature. The only major difference between that case and the one before this Court were the two changes made in § 1161(b)(5) as it was amended in October 1972 to become § 1321(b)(6). The requirement of scienter was deleted and the maximum penalty was reduced from $10,000 to $5,000. The removal of the scienter requirement certainly weighs in favor of a finding that the penalty is not criminal in nature and the reduction of the maximum penalty might be taken to indicate a desire by Congress to avoid even the appearance of a criminal penalty by distinguishing it from the $10,000 maximum criminal

penalty imposed under § 1321(b)(5) for failure to report an unlawful discharge.

After considering the *Mendoza-Martinez* factors the court in *LeBeouf* stated at page 563, "The composite of answers to these factorial inquiries indicate beyond peradventure that paragraph 5 only can be interpreted as punitive." This Court is not persuaded to the same degree by applying these factors since it appears that they are anything but conclusive in their indications. And the changes in the statute since the time with which *LeBeouf* was concerned distinguish the cases measurably.

■ The Court is of the opinion that while the Congress, as a result of its desire to clean up and preserve the waterways of the land, has created a unique situation in which a defendant is automatically liable for a civil penalty when he follows the only route available (notification) to avoid criminal prosecution, nevertheless this is apparently the Congressional intent and changes to such are matters of legislative rather than judicial province.

The second claim of unconstitutionality lodged against the application of § 1321(b)(6) by the Defendant alleges a denial of equal protection of the law. Defendant claims that the provision which requires that "In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered . . .", creates a situation in which different defendants are treated differently based upon a classification of wealth and this is constitutionally impermissible.

■ The Congress has decided, and directed via § 1321(b)(6), that ". . . the size of the business of the owner or operator charged, the effect on the owner or operator's ability to

continue in business . . . .", be taken into consideration "In determining the amount of the penalty . . . ." There can be no doubt that these factors, if actually considered, create a discrimination between defendants who are members of the same class. But such discrimination is not per se a violation of constitutional rights. "Unlike the Fourteenth Amendment the Fifth contains no equal protection clause and it provides no guarantee against discriminatory legislation by Congress." *Detroit Bank v. United States,* 317 U.S. 329, 337, 63 S.Ct. 297, 301, 87 L.Ed. 304 (1943). And even under the Equal Protection Clause of the Fourteenth Amendment absolute equality is not required where wealth is involved. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Only where the discrimination is "so unjustifiable as to be violative of due process", *Shapiro v. Thompson,* 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969), has the Congress stepped beyond its powers. In other words, as long as there is a reasonable basis for the classification which is founded upon a "substantial distinction" between the different parties of the same class and which bears "a proper relation to the objects classified and the purposes sought to be achieved" there is no denial of equal protection. *Pfeiffer Brewing Co. v. Bowles,* 146 F.2d 1006 (Em.App.1945), *cert. denied,* 324 U.S. 865, 65 S.Ct. 914, 89 L.Ed. 1421 (1945).

There can be no doubt that a substantial difference exists between parties subject to the provisions of 33 U.S.C. § 1321(b)(6) particularly in terms of their different abilities to sustain losses as a result of fines, etc. And the classification which results from a consideration of the factors of paragraph (6) was intended to impose penalties to deter unlawful discharges of oil by all parties in the class but does not have as part of its purpose the intention to put those parties out of business who can't afford to pay the $5,000 maximum

penalty. While a $5,000 penalty could be borne by some without fear of going out of business, such could not be said of everyone subject to this statute. This was apparent to the Congress and it acted with this in mind by requiring consideration of these important factors to discourage unlawful discharges of oil without discouraging small companies from entering or remaining in the market.

Defendant asserts in its third attack upon the constitutionality of the statute that paragraph (6) violates the constitutional guarantees of due process and equal protection since it allows no defense to the imposition of penalties for unlawful discharges of oil.

Paragraph (6) states, "No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge." Such a provision was recently upheld against a due process attack in *National Independent Coal Operator's Association v. Rogers Morton,* 161 U.S.App.D.C. 68, 494 F.2d 987 (1974), and clearly provides for the necessary elements of due process.

While the following language from United States Coast Guard Commandant Instruction 5922.11A, para. 3a (February 23, 1973), "It is Coast Guard policy that . . . every discharge in violation of Section 311(b)(6) [33 U.S. C. § 1321(b)(6)] result in the assessment of a civil penalty" indicates that a penalty automatically attaches at the time of an unlawful discharge of oil, it is nevertheless true that, "Any such civil penalty may be compromised" and that "the gravity of the violation shall be considered" in assessing the penalty. These provisions allow a flexibility which may take into account any defenses which parties may raise in their behalf. And any such defenses may be raised at the hearing provided as well.

Defendant's final assertion of unconstitutionality attacks the standard for defining "harmful quantities" as ar-

bitrary and capricious. The standard applied is found in 40 C.F.R. § 110.3(b) and indicates that discharges are harmful which "cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines . . . ."

This regulation was promulgated by the Secretary of the Interior pursuant to authority delegated to him by Executive Order #11548, July 22, 1970, 3 C. F.R. 539 (Supp.1972). The authority for making such regulations was originally vested in the President by Congress via 33 U.S.C. § 1161(b)(3).

There is a presumption of validity in rules duly noticed and made by an administrative agency pursuant to a specific statutory delegation of power. *Gray v. Powell*, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941); *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138 (1935); *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973). This presumption is rebuttable, but only upon a showing that the challenged regulation is an unreasonable exercise of the delegated power—i. e., inconsistent with the statute. *Commissioner of Internal Revenue v. Acker*, 361 U.S. 87, 80 S.Ct. 144, 4 L. Ed.2d 127 (1959); *United States v. Calamaro*, 354 U.S. 351, 77 S.Ct. 1138, 1 L. Ed.2d 1394 (1957); *Boyd, supra*.

The Defendant has presented no evidence that the regulation goes beyond the authority under which it was promulgated. Therefore, the presumption must stand and the Court finds that the standard, as established, was within the scope of the congressional grant of authority.

It thus appearing to the Court that the penalties imposed by the Plaintiff, United States of America, are just and reasonable and that the reasons advanced by the Defendant, Eureka Pipeline Company, for dismissal or summary judgment are without merit, it is hereby

Adjudged and ordered that Defendant's Motion to Dismiss and/or for Summary Judgment be denied and that judg-

ment for the Plaintiff in the amount of $9,900 be granted.

There remaining nothing further to be done in this civil action, it is further ordered that the same be, and it hereby is, dismissed and retired from the docket of this Court.