In re The GHR COMPANIES, INC., f/k/a Good Hope Industries, Inc. GHR Energy Corp., f/k/a Good Hope Refineries, Inc. Southern States, Inc. Southern States Exploration, Inc. Laredo Exploration, Inc. GHR Pipeline Corp., f/k/a Southern Pipe Line Corporation Southern Petroleum Trading Company Ltd., Debtors.

Bankruptcy Nos. 4–83–00060–G, 4–83–00056–G, 4–83–00093–G, 4–83–00094–G, 4–83–00095–G, 4–83–00092–G and 4–83–00136–G.

United States Bankruptcy Court, D. Massachusetts.

June 13, 1984.

Stephen Gordon, McCabe/Gordon, P.C., Boston, Mass., for Good Hope Energy Corp.

Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for Continental Illinois National Bank & Trust Co. of Chicago agent for debtors' secured bank creditors.

Sumner Darman, Silverman & Kudisch, Boston, Mass., for Creditors' Committee (The GHR Companies).

Joseph Braunstein, Riemer & Braunstein, Boston, Mass., for Creditors Committee (GHR Energy).

Van Oliver, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Creditors Committee (GHR Pipeline Corp., Southern States, Inc., So. States Exploration, Inc.).

Stanley Epstein, Epstein, King & Isselbacher, Boston, Mass., for GATX.

## MEMORANDUM AND ORDER ON MOTIONS TO APPOINT EXAMINER

PAUL W. GLENNON, Bankruptcy Judge.

### BACKGROUND

Before the Court is the United States Trustee's ("Trustee") motion for the appointment of an examiner filed April 26, 1983. As authority for its motion, the Trustee points to both 11 U.S.C. § 151104(b)(1) and (2).[1] The Trustee moves for the appointment of an examiner in the cases of six of eight affiliated Debtors whose Chapter 11 cases are and have been proceeding in this Court.[2]

As to six of the above-captioned Debtors, the GHR Companies, Inc. ("Companies"), GHR Energy Corp. ("Energy"), Southern States, Inc., Southern States Exploration, Inc., Laredo Exploration, Inc., and GHR Pipeline Corp. (collectively "Debtors"),[3] the Trustee alleges *inter alia* the following grounds for appointment of an examiner under § 151104(b)(1): (1) The Debtors are consistently late in filing the reports required by the Trustee and have not filed their Schedules and Statement of Affairs, thus close monitoring by a disinterested party is required; (2) If information by one disinterested person—an examiner—was gathered, any duplication of efforts or confrontations by the three creditors' committees and professionals employed by these committees, could be eliminated; (3) The failure of the prior confirmed Act plans of some of these Debtors reflects mismanagement by those in control;[4] (4) The Debtors and other non-filed subsidiaries are incorporated in various states and countries and therefore multiple legal issues will arise; and (5) The nature of the Debtors' business—primarily oil and gas—the instability in the world oil markets, and the size of the Debtors (which would otherwise require submission of information to the Securities and Exchange Commission but for the fact that they are wholly-owned by Stanley) require the services of an independent nonaligned functionary to investigate the financial picture of the Debtors, monitor the disposition of estate assets, and provide frameworks for possible plans of reorganization.

As to Energy only, the Trustee, relying on § 151104(b)(2), states that the appointment of an examiner is warranted because Energy allegedly owes the creditors of Industries more than $5,000,000 pursuant to the confirmed plan of Industries.[5]

---

1. Pursuant to 11 U.S.C. §§ 1501(1) and 15103(f), the provisions of Chapter 15 of Title 11 dealing with United States Trustees, apply in this District, a "pilot" district. Section 151104(b) is identical in all material respects to 11 U.S.C. § 1104(b) except that the former section gives the *United States Trustee the opportunity to* request the appointment of an examiner.

2. The motion fails to include the case of Southern Petroleum Trading Company, Ltd., No. 4–83–00136–G, for no apparent reason. As the case of GHR Transmission Corporation, No. 4–84–00278–G, was originally filed in the Bankruptcy Court for the Eastern District of Louisiana, and transferred to this Court pursuant to 28 U.S.C. § 1475 and Bankruptcy Rule 1014(f) by order dated May 16, 1984 on motion of the Debtors' secured bank creditors and Ingersoll-Rand Co., the Trustee's motion necessarily excludes this latter case.

3. Companies is the parent corporation. Energy is the principal operating company. The stock of the Debtors is wholly-owned by John R. Stanley ("Stanley"). Stanley is also the director and chief executive officer of these Debtors.

4. Companies, f/k/a Good Hope Industries, Inc. ("Industries"), Energy, f/k/a Good Hope Refineries, Inc. ("Refineries"), Good Hope Chemical Corporation, *Southern Pipe Line Corporation* and GHR Transmission Corporation, f/k/a Southern Gas Transmission Co. each filed Chapter XI petitions in this Court in 1975. Plans of arrangement were confirmed in these cases although no final decrees have been entered. Consequently, these Chapter XI cases are still pending in this Court and pursuant to the confirmed plans, this Court has retained jurisdiction over these cases for varying purposes. The change in corporate names was effected in *December of 1980 and was, in fact, a change in* names only.

5. While the Trustee's motion does not specifically allege that the $5,000,000 debt is of the type set forth in § 151104(b)(2), i.e., fixed, liquidated, and unsecured and other than for goods, services or taxes, or owing to an insider, the

On April 28, 1983, GATX Terminals Corporation, GATX Tank Erection Corporation, and GATX Third Aircraft Corporation (collectively "GATX"), creditors of Energy allegedly holding secured claims in excess of $15,000,000, filed a motion seeking the appointment of an examiner in the case of Energy only asserting grounds under § 151104(b)(1). The grounds put forth by GATX are: (1) An investigation should be undertaken to determine whether the filing of the Code Chapter 11 cases soon after confirmation of the Act plans resulted from incompetence, misconduct, or irregularity in the management of Energy's affairs; (2) An investigation should be made of the propriety of a transfer of production payments in late 1982 by Energy to the Bellarmine Foundation; (3) Energy has been delinquent in filing the reports required by the Trustee's office; and (4) Energy has failed to comply, in every respect, with the provisions of Court orders authorizing the use of cash collateral. GATX reserved the right to amend its motion to assert Energy owes fixed, liquidated, unsecured, non-trade debt that exceeds $5,000,000, pursuant to § 151104(b)(2).

Continental Illinois National Bank and Trust Company of Chicago, as agent for the Debtors' secured bank creditors ("Banks") joined in the Trustee's motion.[6] The Banks are owed in excess of $800,000,000 and are allegedly secured by all of the Debtors' assets. The Banks contend that an examiner is warranted in the cases of Energy and Companies, under § 151104(b)(2), as each of these Debtors has debts in excess of $5,000,000 of the type specified in that subsection. In addition to the $5,000,000 debt listed by the Trustee, the Banks allege that Energy and Companies are indebted to the United States Department of Energy ("DOE") in an amount greater than $10,000,000 arising out of a consent order dated July 31, 1979,[7] which indebtedness is unsecured and is not for goods, services, or taxes. The Banks also requested an evidentiary hearing under § 151104(b)(1) relying on *inter alia* the size of the Debtors, the complexity of the Debtors' business and the magnitude of the claims against the Debtors as grounds, if the Court determines the appointment of an examiner is not mandated under § 151104(b)(2).

The DOE sought leave to file a memorandum in support of the Trustee's motion. Leave was granted by the Court in early June 1983.[8] The DOE asserts the Court must appoint an examiner under § 151104(b)(2) as the DOE holds an allowed claim in the amount of $24,684,202.45 against Companies and Energy pursuant to the July 31, 1979 consent order.[9] The consent order was entered into after the DOE sought the recovery of overcharges allegedly made by the Debtors in the sale of petroleum products during the mid-1970's. While the confirmed plan provided the DOE would receive a letter of credit securing payment of its claim in the event of default, the Debtors never provided a letter of credit satisfactory to the DOE.[10] Ac-

---

Trustee does properly plead this allegation in a joint memorandum filed with the Debtors' secured bank lenders on May 24, 1983.

**6.** The caption of the Banks' joinder lists six of the seven then filed cases (excluding GHR Pipeline Corp., No. 4–83–00092–G) although all seven case numbers were included in the caption. *Cf. supra* n. 2, at p. 167.

**7.** In fact, under the terms of the consent order and the confirmed plan of Refineries, the DOE's claim against Industries was allowed in the amount of $33,394,021. All payments on this claim were to be made in the first instance by Refineries and were guaranteed by Industries.

**8.** At a hearing on May 9, 1983, the DOE orally joined in the motions of the Trustee and GATX.

**9.** Pursuant to the consent order and the confirmed plan, some payments were made by Refineries to the DOE. The last payment made was in December, 1982. The exact amount still owing the DOE is disputed. While the DOE alleges it is owed approximately $25,000,000, Schedule A–2 ("Creditors Holding Security") filed in the case of Energy lists the DOE claim as being $21,322,914.27, contingent and unliquidated.

**10.** A detailed history of the DOE—Debtors activities is not necessary. Suffice it to say, all other creditors bargained for and received their security prior to the entry of an order of confirmation. *But see supra*, n. 9.

cordingly, the DOE alleges its claim is of the type specified in § 151104(b)(2).

The Sanko Steamship Co., Ltd., and Sanko Kisen, creditors of Energy, also filed a memorandum in support of the Trustee's motion. These creditors quoted § 1104(b)(2)[11] but failed to refer to any specifics. Additionally, these creditors alleged that because of the complexity of the cases, appointment of an examiner under § 1104(b)(1) [sic] would be in the interests of creditors and the estates.

Objections to the motions of the Trustee and GATX were filed by the creditors' committee of Companies which asserts the appointment of an examiner in the Companies case is not warranted. Generally, the objections state: (1) The guarantee by Companies of the Energy debt is not a sufficient basis for the appointment of an examiner; (2) The accountant employed by the Companies creditors' committee will provide sufficient financial information relative to the case of Companies, as well as all subsidiaries, due to the consolidated nature of the affairs of these companies;[12] (3) Counsel for the Companies creditors' committee is able to resolve all legal issues which may arise no matter what law may govern; (4) The three creditors' committees are coordinating efforts, exchanging information, and otherwise cooperating with one another; (5) An examiner would necessarily be required to disclose otherwise confidential information relative to the Debtors affairs; (6) The additional expenses inherent in the appointment of an examiner are unwarranted; and (7) The Bellarmine Foundation transaction is being investigated by (at least) counsel for the creditors' committee of Companies.

Lastly, the seven filed Debtors submitted a memorandum in opposition to the motions, and the affidavit of W.D. Crays, Executive Vice President for Finance of the Debtors, in support thereof. Basically, the affidavit was submitted to point out that: (1) The Debtors' business and financial activities are already under detailed examination;[13] (2) Energy and Companies have debts of less than $5,000,000 of the type specified in § 151104(b)(2) as the liability of Energy under the Industries' plan is contingent because it is in the nature of a guarantee. Furthermore, the DOE claim is disputed[14] and is for alleged overcharges in connection with goods and services provided by Energy;[15] and (3) The Debtors have complied with the reporting requirements of the Trustee's office. The Debtors assert that an evidentiary hearing is necessary to show that an examiner is warranted, whether the moving parties rely on subsection (b)(1) or (b)(2). Moreover, the Debtors contend that even if the Court finds that the requirements of (b)(2) have been satisfied, it must also find incidents of "fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor" before the Court can authorize the appointment of an examiner under that subsection. *See* Transcript of May 9, 1983 Hearing on motions to appoint trustee.

## DISCUSSION

■ Without first deciding whether any of the Debtors has "fixed, liquidated,

---

**11.** *See supra* n. 1, at p. 167.

**12.** With Court authorization, the creditors' committee of Companies has employed the accounting firm of Fox & Co., the creditors' committee of Energy has employed the accounting firm of Deloitte, Haskins & Sells, and the Debtors have employed Coopers & Lybrand. The Banks have retained the firm of Ernst & Whinney.

**13.** *See supra,* n. 12. Additionally, other professionals have been employed to *inter alia* analyze the economics of a shut-down refinery owned by Energy and located in Good Hope, Louisiana and analyze the gas reserves held by the Debtors in acreage located principally in South Texas.

**14.** While there has been a dispute about whether it is now necessary for Refineries to post security which security was required for the DOE claim pursuant to the confirmed plan, *see supra,* pp. 168–169, and while there is some minor dispute as to the amount still owing the DOE, *see supra* n. 9, at p. 168, the Court is not aware of any basis for the statement that "Energy and Companies vigorously dispute [the DOE's] claim" contained at p. 7 of the affidavit.

**15.** *See supra* nn. 9 and 10, at p. 168, and accompanying text.

unsecured debts, other than debts for goods, services, or taxes, or owing to an insider" in excess of $5,000,000, the Court holds, that as a matter of law, the appointment of an examiner under § 151104(b)(2) is not mandatory in any of these cases.

Section 151104(b) provides:

(b) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the best interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

The Court has conducted a thorough examination of the legislative history of this section and its predecessor sections, attempting to uncover the reasons for a mandatory examiner. This necessarily included discovering the reasons for a mandatory trustee under the Act as there was no prior statutory basis for the appointment of a mandatory examiner.[16] I conclude that § 151104(b)(2) was enacted primarily to satisfy the needs and dictates of a public company operating under the protections and laws of Chapter 11.

[3] These Debtors are unusual for a number of reasons. Most importantly, they are unusual because of their size and form of ownership. Not only are these Debtors large in terms of privately-held companies who have pending Chapter 11 cases but also these Debtors are among the largest privately-held industrial companies doing business in the United States today. Certainly, the sheer size and stature of these cases prompt considerations of the bankruptcy laws different than or distinct from those considerations which apply when dealing with a "typical" Chapter 11 debtor. The Court recognizes the Bankruptcy Code was enacted to promote uniformity in debtor-creditor laws and to that end preempts state laws in many important respects. Cf., e.g., Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). However, the Court does not believe that examination of the purposes of the bankruptcy laws and application of the results gained therefrom to facts sub judice in any way disturbs the attributes of uniformity.

■ Principles of statutory construction direct that the Court examine the legislative history to determine the "object the act is supposed to achieve" and the "mischief at which it was aimed" 2A Sutherland, Statutory Construction § 48.03 at 191 (4th ed. 1984). See also cases cited therein. "Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived." United States v. Fisher, 2 Cranch 358, 386, 2 L.Ed. 304 (1805). "[A]mbiguity is not uniformly insisted on as a prerequisite to the use of aids to construction." Sutherland supra § 48.01 at 182 (footnote omitted). And so, it has been said, that "the process of interpretation should commence with 'consideration of the legislative history to uncover any indications of legislative intent'." Sutherland, supra § 48.01, supplement at 75, quoting United States v. Eureka Pipeline Co., 401 F.Supp. 934, 938 (N.D.W.Va.1975). And further, "even the most basic general principles of statutory construction must yield to clear contrary

---

16. But see, e.g., In re Utilities Power & Light Corp., 90 F.2d 798 (7th Cir.), cert. denied, 302 U.S. 742, 58 S.Ct. 144, 82 L.Ed. 573 (1937) (appointment of examiner warranted to investigate allegations of wrongdoing by directors of debtor corporation as within the court's discretion, based on principles of equity).

evidence of legislative intent." *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). *See also Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). "Typically, a statute may be stretched a little bit beyond its literary terms to effectuate its policies." *Griffen v. Independent School District*, 706 F.2d 645, 651 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983). Use of the word "shall" does not always mean an action is mandatory; just as "may" may connote "must". Sutherland, *supra.* § 57.03 at 416. "Courts may rely upon legislative history to construe a statute in a manner contrary to its plain language when such is necessary to effectuate Congress' intent and understanding of a statute". *Lawrence v. Staats*, 640 F.2d 427, 433 n. 1 (D.C.Cir.1981) (MacKinnon, J., concurring). *See also* cases cited therein.

To explain this Court's conclusion as to the "mandate" of § 151104(b)(2), a lengthy foray into the legislative history and the prior Bankruptcy Act is useful.

As is relevant herein, under the Bankruptcy Act of 1898, as amended in 1938 (Chandler Act), companies seeking the protection of the bankruptcy laws could file petitions under either Chapter X or Chapter XI. Generally, "the two chapters were specifically devised to afford different procedures, [Chapter X was] adapted to the reorganization of corporations with complicated debt structures and many stockholders, [whereas Chapter XI was adapted] to composition of debts of small individual business[es] and corporations with few stockholders ...". *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310 U.S. 434, 447, 60 S.Ct. 1044, 1049, 84 L.Ed. 1293 (1940). "The basic assumption of Chapter X ... [was] that the investing public dissociated from control or active participation in the management, needs impartial and

expert administrative assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." *Id.* n. 6 at, 448–449, 60 S.Ct. n. 6 at, 1049–1050.

Chapter X mandated the appointment of a disinterested trustee in any case where the debtor's liabilities exceeded $250,000. §§ 156 and 158. Rule 10–202. The trustee was to conduct a thorough examination into the debtor's finances and into the management of the debtor. § 167(1) and (3). Rule 10–208. The trustee was required to then report his discoveries, and send this report to all security holders with notice to them to submit to the trustee, proposals for a reorganization plan. § 167(5) and (6). Rules 10–208 and 10–301. The trustee's next duty was to devise a plan or report why one could not be devised. § 169. Rule 10–301. If the debtor's liabilities exceeded $3,000,000, under § 172, the judge was required to refer the plan to the Securities and Exchange Commission ("SEC") for advisory opinions who, with the court's approval, could participate in the proceeding. See also § 173. Rule 10–303. Under § 179, the plan must have received the approval of the holders of two-thirds in amount of each class of allowed creditors' claims whose rights were affected by the plan. Rule 10–305. Upon a finding by the court that *inter alia* the plan was "fair and equitable" the plan became effective. § 221. Rule 10–307. "The aims of Chapter X ... were to afford greater protection to creditors and stockholders by providing greater judicial control over the entire proceedings and impartial and expert administrative assistance in corporate reorganizations through appointment of a disinterested trustee and the active participation of the SEC".[17] *Securities and Exchange Commission v. American Trailer Rentals Co.*, 379 U.S. 594, 604, 85 S.Ct. 513, 519, 13 L.Ed.2d 510 (1965).

---

17. *See also* 6 Collier on Bankruptcy ¶ 0.08 (14th ed. 1978), especially n. 15, at 93–94 wherein the ex-commissioner of the SEC, William Douglas, explains that the protections of Chapter X were

necessary to cure the abuses sustained by security holders in the prior reorganization statute, § 77B.

Chapter XI was recognized as a relatively quick route for a debtor to effect an arrangement of his unsecured debts. Under § 306(1), an arrangement was defined as "any plan of a debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, upon any terms." See also §§ 356 and 357. The appointment of a trustee was not provided for under Chapter XI, unless the case was transferred from a liquidation proceeding wherein a trustee in bankruptcy had been previously appointed. § 332. Rule 11–18. The debtor had relatively complete control over his Chapter XI proceeding. The debtor, with the exception set forth above, remained in possession and continued to operate his business. §§ 342 and 343. Rule 11–18. Only the debtor proposed a plan of arrangement. Under § 362, the debtor must have procured the consent of his creditors holding a majority in number and amount of outstanding unsecured indebtedness. It was then for the court to find the plan was "for the best interests of the creditors" § 366(2).[18] "Congress [has deemed these general creditors] need only the minimal disinterested protection provided by ... Chapter [XI]". *Securities and Exchange Commission v. American Trailer Rentals Co., supra,* at 607, 85 S.Ct. at 520.

"In enacting these two distinct methods of corporate rehabilitations, Congress has made it quite clear that Chapters X and XI are not alternate routes, the choice of which is in the hands of the debtor. Rather, they are legally, mutually exclusive paths to attempted financial rehabilitation."[19] *Id.* "The contrast between the provisions of Chapter X, carefully designed to protect the creditor and stockholder interests involved, and the summary provisions of Chapter XI is quite marked." *Id.* at 605, 85 S.Ct. at 519.

*In Securities and Exchange Commission v. United States Realty & Improvement Co., supra,* the SEC argued that Chapter X was to be employed only by corporations having public debt while Chapter XI was to be limited to those companies which had trade and commercial debt only. The Supreme Court specifically rejected this argument. Emphasizing that bankruptcy courts are courts of equity, the Supreme Court stated: "[T]he real question is, what is the relief which Congress has accorded the bankruptcy and is it more likely to be secured in a Chapter X or Chapter XI proceeding?" *Id.* at 457, 60 S.Ct. at 1054.

*In General Stores Corp. v. Shlensky,* 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956), the Supreme Court again refused to adopt a hard and fast rule which would dictate the proper chapter under which a debtor could seek relief, and reaffirmed its earlier view that the decision was what "would better serve 'the public and private interests concerned including those of the debtor'" *Id.* at 465, 76 S.Ct. at 518, *quoting Securities and Exchange Commission v. United States Realty Co., supra,* at 455, 60 S.Ct. at 1053. The Supreme Court reiterated its position that what was most important was "the needs to be served." *General Stores Corp. v. Shlensky, supra,* at 466, 76 S.Ct. at 519. "Needs to be served ... included such factors as requirements of fairness to public debt holders, need for a trustee's evaluation of an accounting from management or that new management is necessary, and the need to readjust a complicated debt structure requiring more than a simple composition of unsecured debt." 6 Collier on Bankruptcy pt. 1 ¶ 0.12 at 124 (14th ed. 1978). As a general rule, Chapter X was thought to be the appropriate avenue for relief for a debtor who was publicly owned.

---

**18.** While the differing standards for confirmation between Chapter X and XI plans evidence more of the schism behind these two chapters, a discussion of the effects thereby is beyond the scope of this memorandum. As an aside, the Court notes that prior to 1952, Chapter XI, like Chapter X, also required a determination that a plan was "fair and equitable" before it could be confirmed.

**19.** §§ 146(2) and 328 set the "rules" for determining which chapter a debtor should use but were liberal in form and were not, in any way, absolute.

"Public investors are ... generally widely scattered and are far less likely than trade creditors to be aware of the financial condition and cause of the collapse of the debtor. They are less commonly organized in groups or committees capable of protecting their interests. They do not have the same interest as do trade creditors in continuing the business relations with the debtor. Where debt is publicly held, the SEC is likely ... to have become familiar with the debtor's finances .... It seems clear that in enacting Chapter X Congress had the protection of public investors, and not trade creditors, primarily in mind". *Securities and Exchange Commission v. American Trailer Rentals Co., supra,* at 613–614, 85 S.Ct. at 523–524.

The Court has quoted extensively from the three Supreme Court cases to make clear that the appointment of a trustee with the attendant protections was considered necessary where the debtor corporation was publicly held. *See also Securities and Exchange Commission v. American Trailer Rentals Co., supra* n. 11, at 612, 85 S.Ct. n. 11 at 523, wherein the Supreme Court recognized the greater protections offered by Chapter X to public investor creditors. While it might be appropriate for a non-public company to file under Chapter X to take advantage of *e.g.,* the provisions regarding secured debt, the trustee protections *inter alia* were enacted with the public company in mind. *See* 6 Collier on Bankruptcy pt. 1 ¶ 0.12 (14th ed. 1978).

In the early 1970's extensive revisions of the bankruptcy laws began to be undertaken.[20] One of the major points of discussion, and of eventual agreement, was the integration of Chapters X and XI. However, as a result of this integration, questions arose as to what extent the prior provisions of each of these chapters would be maintained. The Commission on the Bankruptcy Laws of the United States ("Commission") formalized its reports in 1973. H.R. Doc. No. 137, 93rd Cong., 1st Sess. pts. I and II (1973). The Commission recommended that the decision whether to appoint a trustee be discretionary and be contingent upon the circumstances of each case. However, the Commission also recommended a statutory rebuttable presumption requiring appointment of a trustee where a corporation had debts of $1,000,000 or more and 300 or more security holders. The presumption would be rebutted by a finding that the protections afforded by the trustee were unnecessary or the attendant costs were disproportionate. *Id.* pt. I at 25, 237 and 253. The Commission recognized that "[a]n independent trustee is often desirable, especially in a case involving the reorganization of a corporate debtor having substantial indebtedness and publicly held securities. At the other end of the spectrum is the closely held corporate debtor whose existing management is essential to the continued operation; in such a case an independent trustee is not always needed and is often counterproductive. An arbitrary dividing line, such as the dollar formula of Chapter X of the present Act, is undesirable. Indebtedness alone is not an adequate criterion. It does not take into consideration the nature of the ownership of the debtor or a need to continue existing management." *Id.* pt. I at 252–53. The Commission's recommendations were formalized at § 7–102 of the Commission's proposed bill. *Id.* pt. II at 221–23. Section 7–102 of the Commission's proposed bill was substantially adopted by the National Conference of Bankruptcy Judges in its report.

In 1974, H.R. 31 and H.R. 32 were introduced. H.R. 31 contained the recommendations of the Commission whereas H.R. 32 contained the recommendations of the National Conference of Bankruptcy Judges. Hearings were held before the House Judiciary Committee, Subcommittee on Civil and Constitutional Rights, during 1976. The SEC filed a report with the subcommit-

---

**20.** The culmination of the revisions resulted in The Bankruptcy Reform Act of 1978 (the "Bankruptcy Code").

tee. *See Bankruptcy Act Revision, Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee of the Judiciary,* 94th Cong., 2d Sess. pt. 4 (1976). The SEC suggested the mandatory appointment of a trustee as under the prior bankruptcy laws, although it recognized the $250,000 floor was outdated and supported the $1,000,000 figure set by H.R. 31 and H.R. 32. The SEC however, recommended that the amount of security holders that would trigger the presumption be decreased to 100 from 300 "because a corporation with more than 100 security holders would most likely have public investors". *Id.* at 2179 (statement of Philip A. Loomis, Jr., Commissioner, Securities and Exchange Commission). The SEC believed the appointment of a trustee turned on the nature of ownership of the debtor. *See also id.* at 2474 (statement of Leonard M. Rosen).

In the Senate, hearings were conducted on S. 235 and S. 236 (essentially revised versions of the two House bills). The Commission's bill and the National Conference of Bankruptcy Judges' bill were examined in the context of the SEC's view. *See The Bankruptcy Reform Act, Hearings on S. 235 and S. 236 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary,* 94th Cong., 1st Sess. pt. II 742–753 (1975). S. 2266 [21] was the next Senate bill dealing with bankruptcy laws, and particularly this subject, prior to the enactment of the Bankruptcy Code. H.R. 8200 [22] was the comparable House bill. S. 2266 proposed a mandatory trustee for public companies and provided what would be a statutory definition of "public company". S. 2266 § 1101(3). "These provisions constitute the basic safeguards for public investors that for 40 years have been part of chapter X, and are incorporated in the bill to serve the same essential purpose. The differentiating standard is not whether the debtor is large or small. It is rather whether the debtor is a public company, as

defined." S.Rep. No. 989, 95th Cong., 2d Sess. 9–10 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5795–5796.

H.R. 8200 deleted the mandatory trustee provisions and instead left the appointment of a trustee to the discretion of the court to be made on a case-by-case basis. The House believed in many cases it would be beneficial to creditors if a debtor remained in possession due to the debtor's familiarity with the business and believed further that a trustee might only add unnecessary expenses. Additionally, the House believed that oftentimes, the failure of a company was not due to any fraud or dishonesty of the debtor but rather due to "simple business reverses". H.R. Rep. No. 595, 95th Cong., 1st Sess. 233 (1977). *See also Bankruptcy Reform Act of 1978, Hearings on S. 2266 and H.R. 8200 Before the Subcommittee of the Senate Committee of the Judiciary,* 95th Cong., 1st Sess., 620–26 (1977). The House wished to do away with the "two-track system" which the Senate bill proposed by treating public companies different from private companies. *See* 124 Cong.Rec. H11,101 (daily ed. September 28, 1978) (statement of Rep. Edwards). The House believed that the enactment of Federal Securities laws and the Trust Indenture Act, and the increased sophistication of public investors created circumstances under which it was no longer necessary that the safeguards of Chapter X be afforded public companies. It must be remembered that these safeguards were essentially the rights of public investors and the SEC to participate in a Chapter X case, and the mandatory appointment of a trustee.

An examiner and a trustee perform distinct functions in Chapter 11 cases. *See* 11 U.S.C. § 1106. This Court finds nothing in the above-mentioned sources which satisfactorily explains why an examiner is mandated where a privately-held debtor has greater than $5,000,000 in non-trade debt. Indeed, most if not all of the "Chapter X protections" would be of no use herein.

---

**21.** S. 2266, 95th Cong., 2nd Sess. (1978).

**22.** H.R. 8200, 95th Cong., 1st Sess. (1977).

While the Supreme Court refused to limit the use of Chapter XI to private companies, the safeguards of Chapter X would only be beneficial to a private company wishing to effect a modification of its unsecured *and* secured debts. The attendant trustee protections would be of very little use to a privately held debtor and its creditors.

Implicit from the lengthy review of the legislative history and the Supreme Court cases, is a finding that public security holders need extra protection which protection can be provided by an independent trustee. In enacting the Bankruptcy Code, both the Senate and House were aware of this. "The new consolidated chapter 11 contains no special procedure for companies with public debt or equity security holders. Instead, factors such as the standard to be applied to solicitation of acceptances of a plan of reorganization are left to be determined by the court on a case-by-case basis. In order to insure that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management, an examiner is required to be appointed in all cases in which the debtor's fixed, liquidated and unsecured debts, other than debts for goods, services, or taxes, or owing to an insider exceed $5 million. *This should adequately represent the needs of public security holders in most cases.*" 124 Cong.Rec. H11,100 (daily ed. September 18, 1978) (statement of Rep. Edwards) and 124 Cong.Rec. S17,417 (daily ed. October 6, 1978) (statement of Sen. DeConcini) (emphasis supplied).

The Court is struggling with the meaning of the legislative history because there is no clear expression of why the mandatory examiner section was enacted. It appears there was some concern about fraud or wrongdoing in a large case. However, it was known that a company's financial demise could result from external forces. H.R.Rep. No. 595 *supra*, at 233. An eminent bankruptcy authority has stated that § 151104(b)(2) "is the only remnant of the 'public company' exception contained in S. 2266." 5 Collier on Bankruptcy ¶1104–28 (15th ed. 1983). "The surface unity of chapter 11 cannot dispense with the need to adapt the single chapter to serve in different ways the requirements of reorganizations that the two chapters have provided separately, each exclusive of the other, for public and nonpublic companies ...." A. Levy, *The Role of the Securities and Exchange Commission and the Judicial Functions under The Bankruptcy Reform Act of 1978*, 54 Am.Bankr.L.J. 29, 32 (1980).

■ The Court finds further support for its position that an examiner is not required in all cases where there is greater than $5,000,000 of non-trade debt in the recent case of *In re Shelter Resources Corp.*, 11 B.C.D. 811, 35 B.R. 304 (Bankr.N.D.Ohio 1983),[23] the only reported decision where § 151104(b)(2) was directly at issue.[24] In that case, the court, after finding that the reasons asserted by the movants for the appointment of an examiner had become moot, stated that "to slavishly and blindly follow the so-called mandatory dictates of Section 1104(b)(2) is needless, costly and non-productive and would impose a grave injustice on all parties herein". *Id.* at 812, 35 B.R. 304.

In the instant case, authorization has been given for the employment of numerous investigatory-type functionaries. *See supra* nn. 12 and 13, at p. 169. Also pending before this Court are motions of various parties in interest to change the venue of these cases to *inter alia* the Southern District of Texas which is not a "pilot" district. This Court has recently announced its intention to transfer these cases to the Southern District of Texas. An order to that effect is forthcoming. One of the reasons the Court deferred ruling on the transfer motion was because of the parties representations that a consensu-

---

**23.** Interestingly, the debtor, Shelter Resources Corp., was publicly held.

**24.** While the case of *In re Lenihan*, 4 B.R. 209 (Bankr.D.R.I.1980) contains a lengthy discus-

sion of § 1104(b)(2), the court was not presented with allegations of greater than $5,000,000 of non-trade debt.

al plan of reorganization would be filed within the year. Based on the Court's familiarity with the Act cases, the Court has retained the cases for what it believes has been the appropriate period of time. The Trustee has stated that in the event of an order transferring these cases, any appointments made by the Trustee prior to the order of transfer would have to be rescinded. In addition, it cannot be debated that the Debtors, the Banks and the unsecured creditors are now engaged in highly adversarial activities. Pleadings have been filed seeking to *inter alia* subordinate the Banks' debt, disqualify the Debtors' bankruptcy counsel, and have a trustee appointed.[25] Many, if not all of the grounds set forth in the motions of the Trustee and GATX have either become moot by the Debtors' compliance or will be the subject of future investigation and judicial scrutiny because of the filing of the above-mentioned pleadings. Since under the terms of § 151104, both a trustee and an examiner may not serve concurrently in the same case, it seems fruitless to appoint an examiner. These Debtors are already expending great sums of money to sustain the expenses of the professionals employed by the various parties-in-interest. In light of the above, the Court additionally finds the appointment of an examiner neither prudent nor mandated.

■ Finally, the Court believes that as to the claim of the DOE, it is not the kind of debt covered by § 151104(b)(2). The DOE claim arose in connection with overcharges made by the Debtors to purchasers of petroleum products. By having the claim funnelled through the DOE for collection, the underlying nature of the claim does not change. The DOE is acting as a representative of those persons aggrieved by the Debtors' actions. Upon the filing of claims by any person aggrieved by the Debtors' actions, the money would be returned to those persons. Indeed, some such claims have been filed. *See* Transcript of Hearing on motions relative to the Debtor's complaint for declaratory relief, and the DOE's complaint to enforce plan of arrangement, October 22, 1981. Therefore, as the DOE claim represents trade debt and not a return of money paid as the Banks' argue, it is not includable under § 151104(b)(2).[26] Furthermore, there is not greater than $5,000,000 of debt in the Industries case.[27] Moreover, as set forth above, because the underlying DOE debt in Refineries was trade-debt, any guarantees by Industries (if still enforceable because the DOE never received security) would be similarly classified.

■ Since my conclusions pertain only to § 151104(b)(2), the question of whether an examiner should be appointed under § 151104(b)(1) is left open. This requires an evidentiary hearing.

---

**25.** Indeed, the Trustee has joined in the pending motion of the Banks seeking to have a trustee appointed.

**26.** The DOE alleges that its claim represents a penalty. In the case of *In re West Texas Marketing Corp.,* slip op. (No. 182–00034 June 21, 1983 as supplemented August 9, 1983) the court found that the claim of the DOE, which arose because the debtor overcharged the public in selling crude oil, was a penalty. In that case, the court addressed the question of whether the DOE claim represented an "actual pecuniary loss" to the DOE under § 726(a)(4) of the Bankruptcy Code. It did not address the question of the underlying nature of the claim in the context of § 151104(b)(2).

**27.** A proof of claim filed in February 1983 in the case of Energy by counsel to the creditors' committee of Industries states the unpaid debt owing Industries' creditors is $4,487,164.50.